# 22-808

### In the United States Court of Appeals
### for the Second Circuit

Oleg Gerzhgorin,

  Plaintiff - Appellant,

v.

Selfhelp Community Services, Inc.,
Russian Holocaust Survivors Program,

  Defendants - Appellees.

On Appeal From a Judgment of the
United States District Court
for the Eastern District of New York
LaShann Monique DeArcy Hall
U.S. District Judge

---

## PLAINTIFF-APPELLANT'S BRIEF ON APPEAL

---

Oleg Gerzhgorin
[NTC Pro Se]
1818 Avenue L Apt. 4F
Brooklyn, NY 11230
Direct: 718-913-6846
omgersh@yahoo.com

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement and Statement of Jurisdiction . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case and of the Facts . . . . . . . . . . . . . . . . . . . . . . . 3
   A. Statement Under Local Rule 28.1 . . . . . . . . . . . . . . . . . . . . . . . 3
   B. Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      2. Discrimination Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
         a. Disparate Treatment . . . . . . . . . . . . . . . . . . . . . . . . 6
         b. Discriminatory Acts . . . . . . . . . . . . . . . . . . . . . . . . . 7
         c. Discriminatory Statements . . . . . . . . . . . . . . . . . . . . 9
      3. Plaintiff's Allegations of Protected Activity . . . . . . . . . 12
         a. Advocacy for Different Music . . . . . . . . . . . . . . . . . 12
         b. Advocacy for Observance of Traditions . . . . . . . . . 15
         c. Advocacy Relating to Keeping Kosher . . . . . . . . . 17
      4. Defendant's Claims Concerning Plaintiff's Performance 17

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   A REASONABLE JURY COULD RETURN A VERDICT FOR
     THE APPELLANT: THIS IS A CLASSIC CASE WHERE
     INTENT MUST BE INFERRED FROM
     CIRCUMSTANTIAL EVIDENCE FOUND IN AFFIDAVITS
     AND DEPOSITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     B. Retailiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     C. Religious Discrimination: "Same Actor" Inference
   Inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
     D. Hostile Work Environment . . . . . . . . . . . . . . . . . . . . . 40

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

i

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>46</u>

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
    TYPEFACE REQUIREMENTS, AND TYPE-STYLE
    REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>47</u>

# Table of Authorities

## Federal Cases

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113 (2d Cir. 2004) . . 23

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . 23

Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 38

Bookman v. Merrill Lynch, No. 02 Civ. 1108 (RJS), 2009 U.S. Dist. LEXIS 40766, 2009 WL 1360673 . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Byrnie v. Town of Cromwell Bd. Of Educ., 243 F.3d 93 (2d Cir. 2001) 38

Castagna v. Luceno, 2013 U.S. Dist. LEXIS 14932, 2013 WL 440689 36

Cifra v. G.E. Co., 252 F.3d 205 (2d Cir.2001) . . . . . . . . . . . . . . . . . . . 28

Collins v. N.Y. City Transit Auth., 305 F.3d 113 (2d Cir. 2002) . . . . . 27

Copeland v. Rosen, 38 F. Supp. 2d 298 (S.D.N.Y. 1999) . . . . . . . . . 35, 36

Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . 23

Feingold v. New York, 366 F.3d 138 (2d Cir. 2004) . . . 25, 41, 42, 43, 44

Finn v. Kent Sec. Servs., Inc., 981 F. Supp. 2d 1293 (S.D. Fla. 2013) . 32

Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Grady v. Affiliated Cent., Inc., 130 F.3d 553 (2d Cir. 1997) . . . . . . 35, 36

Graham v. Long Island R.R., 230 F.3d 34 (2d Cir. 2000) . . . . . . . . . . 24

iii

Gregory v. Daly, 243 F.3d 687 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Guippone v. BH S & B Holdings LLC, 737 F.3d 221 (2d Cir. 2013) . . . 23

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . 41

Hicks v. Baines, 593 F.3d 159 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . 28

James v. New York Racing Ass'n, 233 F.3d 149 (2d Cir. 2000) . . . . . . 38

Jetter v. Knothe Corp., 324 F.3d 73 (2d Cir. 2003) . . . . . . . . . . . . . . . 35

Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407 (2022) . . . . . . . . . 39

Kirschenbaum v. Assa Corp., 934 F.3d 191 (2d Cir. 2019) . . . . . . . . . 23

Kugel v. Queens Nassau Nursing Home, 568 F. Supp. 3d (E.D.N.Y.
    2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Leifer v. N.Y. State Div. of Parole, 391 F. App'x 32
    (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 42, 44

Littlejohn v. City of New York, 795 F.3d 297 (2d Cir. 2015) . . . . . . . . 31

Lopez v. New York City Dep't of Educ., No. 17 Civ. 9205 (RA), 2020 WL
    4340947 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Lowman v. NVI LLC, 821 F. App'x 29 (2d Cir. 2020) . . . . . . . . . . . . . 34

Mandell v. County of Suffolk, 316 F.3d 368 (2d Cir. 2003) . . . . . . . . . 24

Manigaulte v. C.W. Post of Long Is. Univ., 659 F. Supp. 2d 367
    (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842
    F.2d 590 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

McGuinness v. Lincoln Hall, 263 F.3d 49 (2d Cir. 2001) . . . . . . . . . . 27

McMenemy v. City of Rochester, 241 F.3d 279 (2d Cir. 2001) . . . . 29, 30

Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Natofsky v. City of New York, 921 F.3d 337 (2d Cir. 2019) . . . . . . . . 31

O'Diah v. Oasis, 954 F. Supp. 2d 261 (S.D.N.Y. 2013) . . . . . . . . . . . 36

Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206 (2d Cir.2004). 40, 42, 43

Piper v. Metro Sols., LLC, No. 818CV3038TTPBJSS, 2021 WL 1341460 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Rasmy v. Marriott Int'l, Inc., 952 F.3d 379. . . . . . . . . . . . . . . . . . 24, 25

Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114 (2d Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Richardson v. New York State Department of Correctional Service, 180 F.3d 426 (2d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Rightnour v. Tiffany & Co., 354 F. Supp. 3d (S.D.N.Y. 2019) . . . . . . . 39

Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Rosen v. Thornburgh, 928 F.2d 528 (2d Cir. 1991). . . . . . . . . . . . . . . 27

Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597 (2d Cir.2006) . 42, 43

Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712 (11th Cir. 2002) 32

Vega v. Hempstead Union Free School Dist., 801 F.3d 72 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Wimmer v. Suffolk County Police Dep't, 176 F.3d 125 (2d Cir. 1999) . 29

Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834 (2d Cir. 2013) . . . . . . 28

## Federal Statutes

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 621 et seq. ("ADEA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

42 U.S.C. § 2000e et seq. ("Title VII"). . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

42 U.S.C. § 8-107 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## State Statutes

NYCHRL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

vi

## Preliminary Statement and Statement of Jurisdiction

Oleg Gerzhgorin brought this action alleging discrimination on the basis of religion, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq. ("NYCHRL") and discrimination on the basis of his age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA") and the NYCHRL. A11 *et seq*. He appeals[1] from a judgment of the United States District Court for the Eastern District of New York (LaShann Monique DeArcy Hall, D.J.), entered on March 30, 2022, which dismissed his complaint. A736, A737. Notice of appeal was timely filed on April 12, 2022. A737.

Since appeal is taken from a final judgment, this Court has jurisdiction under 28 U.S.C. § 1291. The district court had federal question jurisdiction under 28 U.S.C. § 1331.

---

[1]. The appeal is limited to the causes of action other than and discrimination on the basis of his age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA") and the NYCHRL. Appellant is forced to concede that these causes of action are insufficient.

1

## Statement of the Issues

1. Whether there are triable issues of fact concerning plaintiff's claims of discrimination on the basis of religion, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq. ("NYCHRL").

2. Whether it was error to grant defendant's motion for summary judgment.

## Statement of the Case and of the Facts

A. <u>Statement Under Local Rule 28.1</u>

Plaintiff Oleg Gerzhgorin brought this action, pro se, against

Defendants Selfhelp Community Services, Inc. ("Selfhelp") and the

Russian Holocaust Survivors Program ("RHSP," collectively,

"Defendants") for discrimination on the basis of religion, and retaliation

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e et seq. ("Title VII") and the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-107 et seq. ("NYCHRL") and discrimination on

the basis of his age in violation of the Age Discrimination in

Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA") and the

NYCHRL in the United States District Court for the Eastern District of

New York. A28.

Following the completion of discovery, the Defendants made a

motion for summary judgment. The Honorable LaShann DeArcy Hall,

District Judge, referred the Defendants' motion to Magistrate Judge

Peggy Kuo for a report and recommendation. Magistrate Judge Kuo

recommended that the motion be granted. On de novo review, Judge

Hall accepted the report and recommendation.

3

The Magistrate Judge's opinion may be found at 2021 WL

8013836. Judge Hall's opinion may be found at 2022 WL 912523.

B. Statement of Facts

1. Background

Plaintiff Oleg Gerzhgorin is a licensed social worker and identifie

an Orthodox Jew. A469, A557. He was born in Belarus, then part of the

former Soviet Union, and came to the United States in 1995. A469,

A557.

Defendant Selfhelp was founded on November 10, 1936 in New

York City by a group of German émigrés, to help newly arriving

European Jewish refugees fleeing from Nazi persecution establish

themselves in America while maintaining their independence and

dignity. A462. Selfhelp's Russian Holocaust Survivor Program

("RHSP") serves Holocaust survivors in North America, caring for over

4,500 elderly and frail individuals. A463. The Director of the program is

Mariam Khachatryan ("Khachatryan"), who is not Jewish. A467.

In May 2017, Plaintiff applied for a job as a social worker with

RHSP and interviewed with Khachatryan. A469, A470.They did not

discuss religious beliefs, but Plaintiff discussed being a descendant of

4

Holocaust survivors. A470, A558. Plaintiff also asked about time off for Jewish holidays and about needing to leave early enough on Fridays to observe the Sabbath. A470. Khachatryan told him that Selfhelp is closed on Rosh Hashanah and Yom Kippur, and that there was a generous leave policy, so holidays should not be a problem; she also explained that she has allowed employees to adjust their work hours in order to leave early on Fridays. A470. Khachatryan knew Plaintiff was an Orthodox Jew when she made the decision to hire him. A470-71.

Plaintiff began working as a social worker for RHSP on July 3, 2017. A471. Once hired, Plaintiff was subject to a six-month probationary period. A471. Fakhriniso Woolley was Plaintiff's immediate supervisor during the entire term of Plaintiff's employment with RHSP. A471. Plaintiff's employment was terminated on October 17, 2017. A521. Both Woolley and Khachatryan were involved in the decision to terminate Plaintiff's employment. A521.

Plaintiff inquired as to the reason for his termination, and Khachatryan replied that he was not a good fit for the program, and she also mentioned that he did not do a sufficient number of home visits. A522. The Personnel Action Form, noted that the reason for

5

Plaintiff's termination was that he "did not pass orientation period."

A522.

### 2. Discrimination Claims

#### a. Disparate Treatment

Plaintiff was required to have supervisory sessions with Woolley

which were lengthier than his co-workers'. A505-506. These meetings

were also held with the office door closed, which violates the religious

prohibition of seclusion ("yichud")[2]. A561-A562. This violated a best

practice standard of the National Association of Social Workers, which

emphasizes that supervisors should develop knowledge about the

culture of those they supervise. A562.

This practice came about or increased after Plaintiff raised

concerns about diversity and cultural issues. A562. In his Affirmation,

he states, "When I brought to Ms. Woolley'[s] attention diversity and

cultural issues, my supervision sessions became lengthier and mostly

_____

[2]. Yichud, Halachipedia,
http://halachipedia.com/index.php?title=Yichud
[https://perma.cc/4JMK-B99J]. See Ari Herbert, Portlandia,
Ridesharing, and Sex Discrimination, 115 Mich. L. Rev. Online 18, 23
(2016)

behind closed doors, even after I informed Ms. Woolley that it created the issue of yichud (prohibition of seclusion)." A561. This issue was confirmed by Rabbi Lekht, who found it to be a serious religious violation. A531.

Woolley required Plaintiff to copy her on all his emails, which he believed was not required of other workers or part of his job description. A506. Plaintiff also spoke with another social worker and Orthodox Jew, Larisa Tsekhanskaya, who also said that she did not have to copy her supervisor on her emails. A506. Woolley claimed that she had a general policy of requiring that workers copy her on any client email sent out. A507. Plaintiff believed this requirement "could be part of retaliation." A91

### b. Discriminatory Acts

Defendants engaged in conduct that either directly discriminated against him, or that support an inference of discriminatory intent in their later termination of him.

At the beginning of September or end of August, there was an "end of summer" party for RHSP staff, organized by Khachatryan to which staff members brought food. No one volunteered to bring kosher

food, so Plaintiff believed he needed to bring something kosher so he could participate. Although one person was responsible for buying food using money contributed by other staff members, Plaintiff did not speak to that person about purchasing some kosher food. A507. "Khachatryan responded [to an email] that she couldn't care less about food choices including my kosher choice ridiculing my kashrut observance and making me bring my food." A578.

Defendants allowed an Orthodox Rabbi "to give a lecture about meaning and traditions of High Holidays," even though Woolley considered Plaintiff's holding of the four species on Sukkot to be an "explicitly religious activity." A570.

In or about September 2017, Plaintiff requested time off for the Jewish holidays. A482. Woolley informed him that Selfhelp already gave its employees Rosh Hashanah and Yom Kippur off, but Plaintiff needed time off for additional Jewish holidays around that time. A482. Woolley acceded to his "request only after [he] repeatedly said that [he] was not allowed to work on Jewish holidays, and she left [Plaintiff] no choice but to quit [his] job." A579, A482.

While Plaintiff "was out of the office for a religious observance"

8

on October 12 and 13, 2017, Woolley "bull[ied]" him on October 12 and

13, 2017 when she "called [his] clients for the purpose of soliciting

complaints with the intention to damage [his] reputation." A572.

On an unspecified date, Woolley sold Plaintiff a bottle of kosher

wine given to one of the social workers by a client because she knew he

was kosher and thought he might be interested in it. Plaintiff

purchased it for approximately three to five dollars. A508. Plaintiff

said that he "paid whatever price [Woolley] told him" "[t]o avoid

embarrassment and humiliation in front of his coworkers." A508.

c. Discriminatory Statements

Various employees of Defendants made comments to Plaintiff that

were "harassing" or discriminatory. He also perceived some of these

statements as indicating cultural insensitivity toward clients.

For her birthday, Woolley held a birthday lunch party for

employees at a non-kosher restaurant; as a result, Plaintiff could not

attend. A508. Plaintiff was told by a co-worker that "his values of

kashrut observance were ridiculed at this party," and that people

criticized him for not attending. A508.

At some time, Woolley told Plaintiff that they serve kosher food at

9

client social events because the events take place in a Jewish center. Plaintiff felt that this was an expression of anti-Jewish feelings because she was generalizing about all clients. A509.

On unspecified dates, Plaintiff heard co-workers make negative comments about not liking kosher food. A99. Plaintiff did not complain to anyone about these comments. A99.

Plaintiff heard a co-worker say, "They get divorced to get more benefits," and "They used to complain in the Soviet Union. Now they complain here." A509. Plaintiff does not know who was referenced in these comments. A116. The same co-worker also said to an intern that Jews cheat on their wives because they are always pregnant, and that Orthodox Jews go to Russian bathhouses and stare at women. A510. Plaintiff did not report these comments to anyone at Selfhelp. A510.

Co-worker Tsekhanskaya told Plaintiff that Khachatryan said descendants of Holocaust survivors are not entitled to anything. A510. Khachatryan does not deny making that comment. A510-A511. She explained that it was pursuant to a rule on German reparations which only entitled survivors, not their descendants, to benefits. A510-A511.

In late September, Khachatryan made various statements that

10

Plaintiff perceived as "portraying all Jews in negative ways" and "exhibit[ing] unconscious biases affecting her judgment." A565. After stating, "I am not Jewish," A524, she stated that Jews lost their faith after the Holocaust. A 514. She stated that clients did not even know what Tu Bishvat[3] was. A515. She said that clients eat pork. A515.

Khachatryan explained that she has learned that many Jewish Holocaust survivors did indeed lose their faith, especially those who lived in the former Soviet Union, because they were not permitted to learn about or practice Judaism. A514. She relayed the story about the client passing out to illustrate how the coffee houses are meant to allow clients to relax without being concerned with the problems of others. A515. With her statement about not knowing about Tu Bishvat, Khachatryan explained that she was trying to convey that many clients are not observant and are sometimes surprised to learn of certain

---

[3]. The 15th of Shevat on the Jewish calendar is the day that marks the beginning of a "new year" for trees. Commonly known as Tu Bishvat, this day marks the season in which the earliest-blooming trees in the Land of Israel emerge from their winter sleep and begin a new fruit-bearing cycle.
https://www.chabad.org/library/article_cdo/aid/3264/jewish/15-Shevat.htm

11

holidays. A515. Finally, Khachatryan explained that many clients do eat pork, and workers must be sensitive to different levels of religious observance. A515-A516.

Plaintiff did not complain to anyone about any of these comments by co-workers or supervisors, or of conduct toward him that he found discriminatory. A520. He testified, "I did not feel comfortable to complain about everything. So I complained about major issues that I thought would be helpful to improve the program in general, not the things that concerned myself."A99. He explained that he was concerned he "could jeopardize my employment.... Because I had a bad experience ten years before" at a different job. A108. He also stated, "People don't like complainers." A108, A520.

### 3. Plaintiff's Allegations of Protected Activity

#### a. Advocacy for Different Music

When Plaintiff learned that Inessa Matevosyan, the case worker in charge of selecting musicians for the coffee houses, was seeking musicians to perform Hebrew and Israeli songs, Plaintiff suggested a musician named Mendy Wax. A563. Although Woolley "admitted that he 'plays beautiful and has a nice voice,'" Plaintiff claims that she

12

rejected him "after she obviously noticed that on provided sample video clips Mr. Wax was dressed as an Orthodox Jew." A563.

This issue was corroborated by Rabbi Lekht: "Some of attendees in a confidential conversation criticized lack of cultural diversity in music and inappropriate musical choices around major Jewish holidays, but they were afraid to complain because it could trigger retaliation . . . . Such limited and inadequate music choice, in my opinion, was not only culturally insensitive to Holocaust survivors, but also hostile to participating in this thematic event observant Jews including myself." A533.

Woolley had put Plaintiff "in charge of information and education" at the coffee houses. A563. At the September 14, 2017 coffee house, the performing musician was late, nervous, and played "old gypsy songs and he was using existing audio recordings." A564. Plaintiff thereafter wrote an email dated September 25, 2017, to Woolley and Khachatryan with the subject line "a fresh look at music for CH." A389. In it, Plaintiff wrote, "gypsy music is not the best choice for Rosh Hashanah or upcoming Sukkot." A389. He indicated that he had spoken to Mateyosyan, who "doesn't seem to be sensitive to this matter." A389.

13

Woolley responded by email, stating, "We haven't heard any complain[t]s from clients about the music for Coffee Houses," and telling Plaintiff that if he comes across any such complaints, he should refer them to a supervisor or director. A389. Plaintiff replied within minutes, stating that "it's not about complain[t]s—it's about cultural sensitivity and choices ..." A389. Woolley responded again, stating, "The music was in Russian, clients understood the words, related to music and were able to dance. About the choice—there are different singers performing at different CH. Clients always have variety." A389. Plaintiff wrote back, "Rosh Hashanah is not about dance or words in Russian, it's about meaning and beginning. . . . Upcoming Sukkot is a time of rejoicing and it might be appropriate to invite someone who performs Jewish music—Israeli, Hassidi etc. By the way, we have many observant clients who would only appreciate it." A389.

Two days later, during his supervision session with Woolley, Plaintiff again raised the issue of using different musicians. A513. Because Plaintiff "continued to press the point so hard," Woolley suggested they go to Khachatryan's office to discuss the issue with her. A513. Khachatryan expressed appreciation for Plaintiff's concern for

14

the clients' spiritual well-being but explained that the issue Plaintiff raised was not a problem. However, "Plaintiff continued to argue that they were being religiously and culturally insensitive to the clients and that 'gypsies' should not be singing to clients around significant Jewish holidays." A513.

At one point during the meeting, after Woolley had left, Plaintiff and Khachatryan continued talking. Khachatryan made the statements described above.

### b. Advocacy for Observance of Traditions

Plaintiff took issue with what he perceived to be insensitivity and discrimination toward observant clients in the scheduling of trips. "Indeed, many trips were scheduled close to Jewish holidays when observant clients couldn't attend." A22. "Scheduling trips on Shabbat or holidays when they cannot participate is not only culturally insensitive, but also discriminatory." A560.

In or around the second week of October, Plaintiff wanted to share information about the "four species"—plants associated with the

15

holiday of Sukkot[4]—at a coffee house. A517. He began to go from table to table, speaking with each client individually about the meaning of Sukkot, and presenting them with the four species to hold. A517. Woolley followed Plaintiff and "seemed to be very upset." A517. Plaintiff believed she was recording him on her cellphone, although he could not see what was on her phone and he did not ask if she was recording. A517. According to Defendants, allowing Plaintiff to continue with each client in this way "would have thrown the coffee house way off schedule." A517. Woolley told Plaintiff he was not supposed to do what he was doing, and when asked why, she told him that the clients were "not traditional." A518. She told Plaintiff that instead of approaching each client individually, he should go to the microphone and tell all the clients at once about the four species and Sukkot. Plaintiff did so. A518. He did not invite clients at the end of the presentation to approach and hold the four species because he felt his

---

[4]. The four species symbolize four types of Jews, with differing levels of knowledge and observance. Bringing them together represents Jewish unit despite external differences.
https://jewishheartnj.org/news/sukkots-four-species-speak-to-jewish-div ersity-and-unity

16

supervisor had prohibited it. He did not ask if he could make that offer. A518.

### c. Advocacy Relating to Keeping Kosher

Plaintiff claims that Defendants' case workers "were not instructed on how to handle kosher food delivery, Jewish holidays, grief/loss/bereavement questions clients asked," and Woolley failed to develop a referral partnership to provide kosher food delivery. A561. He also claims he discussed with Khachatryan an issue he observed with staff not using the proper utensils to ensure full observance of the laws of kashrut (keeping kosher), but that he did not "feel that she was going to make any changes." A498.

Defendants maintain that one of the other RHSP workers, who is an Orthodox Jew, was already assigned to ensuring that the kitchen was maintained in a kosher manner. A499. According to Rabbi Lekht's affidavit, however, the same person assigned to oversee Kashrut observance was his father's case worker and couldn't answer any kashrut-related questions. A535-A536.

### 4. Defendant's Claims Concerning Plaintiff's Performance

Plaintiff described his first two months of work as a "honeymoon"

17

during which he was praised for "doing a great job." A467, A505, A560.

Toward the end of September and early October, Woolley claimed to have received several complaints from clients and clients' family members about Plaintiff. A498. Woolley began soliciting and documenting clients' complaints after her "major issues" email. A501-A502.

These included complaints that Plaintiff refused to take an application for hearing aids from a client at the coffee house on October 12, 2017, that Plaintiff had not invited some clients to several coffee houses, that he failed to show up for scheduled home visits, that he failed to assist a client with an issue with the utility company despite her request, that he asked a client to call him back after the holidays in response to her request for assistance in getting grab bars in her bathroom, and that he had prepared an incomplete benefits application for a client which resulted in a delay in her receipt of services. Plaintiff's case notes reflected information other than what the clients alleged. In addition, several clients also complained that they lacked emotional connection and care from Plaintiff. *Id.*

The number of complaints against Plaintiff was purportedly

18

greater than for the average worker, and because they occurred within a relatively short amount of time, and "there was a common thread" among them, this raised a "red flag" for Khachatryan. A499.

Woolley decided in or about the end of September to perform an audit of Plaintiff's client files and case notes "to better evaluate his compliance with work standards." A503. She discovered "many significant performance problems." A503. On October 3, 2017, Woolley met with Plaintiff to discuss these issues and "counsel him on his immediate required improvement." A502.

According to Plaintiff, although Woolley had "never addressed any minor deficiency during weekly supervisory meetings, [she] suddenly found 'major issues' in my performance blaming me for following RHSP policies prohibiting blind home visits" and refusing to make referrals for assistance without client consent. A566. He characterizes the timing of Woolley's email as "suspicious." A567.

Plaintiff purportedly only called one of the two missing clients, and Woolley had to call the other client herself on October 10. A503. Plaintiff also purportedly did not call at least one of the "inactive" clients, that is, those who had not been contacted in September, by

19

October 13, as instructed. Defendants contended that, as of October 16,

Plaintiff had conducted only seven home visits, and had not set up or

conducted home visits for 25 clients. A486-487.

Defendants contended that he did not make, or attempt to make,

monthly contact with many of his clients; when he was unable to reach

them, he did not notify management as required. A483. As of October 3,

2017, Plaintiff had failed to make home visits to approximately 29 of his

clients. A483. The case notes maintained by the Defendants show that

clients left telephone messages for Plaintiff on nine occasions, but he

failed to return their calls. There were eight instances of client requests

or emergency situations which were not timely addressed. A486. These

included requests for assistance to file an appeal of a denial of benefits,

obtain increased home care hours, order medical supplies, and apply for

Access-A-Ride transportation services. *Id.*

Several of Plaintiff's case notes failed to provide substantive

information about the client, stating only that he called the client and

what he attempted to do, but nothing about the client's status or

response. A492-A493. Finally, the case notes show that Plaintiff failed

to place "even a single call" to 23 of his clients to invite them to a coffee

20

house, and two clients complained to Woolley that they were not called even though Plaintiff's case notes indicate that he called them. A494-A495

Plaintiff purportedly arrived late to coffee houses and left early, despite being told this was unacceptable. A497. During the coffee houses, he often stayed in the kitchen instead of mingling with clients in the main room, even after food had been distributed to the clients. A497. In the kitchen, Plaintiff "took it upon himself to monitor and oversee the food apportionment process, to ensure that the laws of kashrut [keeping kosher] were fully observed," claiming that kitchen staff had not been properly instructed in proper use of "meat" and "dairy" utensils. A497.

In his affidavit, Plaintiff explains that "the decision to terminate my employment matured during the meeting and Ms.Woolley understood Ms.Khachatryan's verbal instruction that everything should be documented as a greenlight to find a ground for my termination. There were not any performance deficiencies or complaints from clients brought to my attention []either before no[r] during that meeting. Ms.Woolley has never issued me any counseling memorandums, verbal warning notices, [not has] Ms. Khachatryan. There is a well-known

21

axiom in social work: if it is not recorded, it did not happen." A566.

The so-called "major issues" were "suddenly found." A567. "[A] day before during the supervision session no issues or complaints from clients were mentioned." A567. Plaintiff never saw any written warnings until he commenced this litigation. A568. The audit was questionable as it simply imbedded in the disciplinary action forms so called complaints she solicited on October 12. The results of Ms. Woolley's audit is questionable at best as she failed to find and document any performance problems in the past and was obviously seeking revenge for my negative feed back about her lack of cultural sensitivity." A569.

22

## Standard of Review

The standard of review for motions for summary judgment is de

novo. *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir.

2013) (internal quotation marks omitted). On a motion for summary

judgment, this Court will "construe the evidence in the light most

favorable to the [non-moving party], drawing all reasonable inferences

and resolving all ambiguities in their favor." *Darnell v. Pineiro*, 849 F.3d

17, 22 (2d Cir. 2017) (internal quotation marks omitted). Summary

judgment is appropriate only if, "based on the pleadings and evidentiary

submissions," *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 196 (2d Cir.

2019), "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

The court "is not to weigh the evidence but is instead required to

view the evidence in the light most favorable to the party opposing

summary judgment, to draw all reasonable inferences in favor of that

party, and to eschew credibility assessments." *Amnesty Am. v. Town of

W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); see *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment

23

is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

This Court has also held that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. See *Rasmy v. Marriott Int'l, Inc.,* 952 F.3d 379, 392 n 61 (2d Cir. 2020) (quoting *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue.")). "In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'" *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000)).

24

## ARGUMENT

## A REASONABLE JURY COULD RETURN A VERDICT FOR THE APPELLANT: THIS IS A CLASSIC CASE WHERE INTENT MUST BE INFERRED FROM CIRCUMSTANTIAL EVIDENCE FOUND IN AFFIDAVITS AND DEPOSITIONS

A. Introduction

This is a classic case where the grant of summary judgment to an employer is interdicted because intent is at issue, which must be inferred from circumstantial evidence. See, e.g., *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 392 n 61 (2d Cir. 2020) (quoting *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994).

As this Court explained in *Richardson v. New York State Department of Correctional Service*, 180 F.3d 426 (2d Cir.1999), that hostile work environment claims present "mixed question[s] of law and fact" that are "especially well-suited for jury determination." *Id.* at 437 (internal quotation marks omitted).

This is doubly so in cases of religious discrimination. See, e.g., *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) ("Feingold has offered proof sufficient to allow a fact-finder to conclude that he experienced pervasive discriminatory intimidation, ridicule, and insult

25

because he was Jewish. Feingold alleges that anti-Semitic remarks
(such as the mocking of his name using other 'Jewish-sounding' names,
and comments about Jewish lawyers) were routine"); *Leifer v. N.Y. State
Div. of Parole*, 391 F. App'x 32, 33 (2d Cir. 2010) (Evidence "included
anti-Semitic actions and comments, and the failure to apprehend the
person responsible for defacing the employee's wedding picture. Viewing
the evidence in the light most favorable to the employee, a reasonable
jury would have found the interactions to be sufficiently hostile to have
altered the employee's working conditions for the worse. Because the
employee proffered sufficient evidence to establish a genuine issue of
material fact concerning his hostile work environment claim, that claim
should have been presented to a jury.").

Indeed, even where the "facts are undisputed does not
automatically mandate summary judgment; rather, summary judgment
is appropriate only where application of the law to those undisputed
facts will reasonably support only one ultimate conclusion." *Richardson,*
180 F.3d at 438.

Here the facts are not undisputed. Plaintiff's affidavit refutes all of

26

the Defendant's claims offered in support of the evident discrimination.

In addition, the affidavit of Rabbi Lekht, and exhibits attached thereto,

totally ignored by the district court, plainly shows that there is a triable

issue of fact on the claims raised by Plaintiff.

"Generally speaking, a plaintiff's burden of establishing a prima

facie case in the context of employment discrimination law is 'minimal.'"

*Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)

(quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001)).

This is so because

> employment discrimination is often accomplished by discreet
> manipulations and hidden under a veil of self-declared
> innocence. An employer who discriminates is unlikely to
> leave a 'smoking gun,' such as a notation in an employee's
> personnel file, attesting to a discriminatory intent. (citations
> omitted). A victim of discrimination is therefore seldom able
> to prove his or her claim by direct evidence and is usually
> constrained to rely on the cumulative weight of
> circumstantial evidence. (citations omitted). Consequently, in
> a Title VII action, where a defendant's intent and state of
> mind are placed in issue, summary judgment is ordinarily
> inappropriate.

Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991).

Each cause of action is thus analyzed below.

27

## B. Retailiation

To establish a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity known to defendants; (2) an employment action that disadvantaged him; and (3) a causal connection between the protected activity and the adverse employment action. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d Cir.2008). Once a plaintiff establishes prima facie retaliation, the burden shifts to the defendants to proffer a "legitimate, nonretaliatory reason for the challenged employment decision," whereupon the burden shifts back to the plaintiff to demonstrate that defendants' rationale is "merely a pretext for [the] impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir.2001), put another way, "show that retaliation was a substantial reason for the adverse employment action." *Hicks*, 593 F.3d at 164 (internal quotation marks omitted).

Retaliation claims brought under the NYSHRL are governed by the same standards as retaliation claims brought under Title VII. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

28

Since it is undisputed that Plaintiff's termination constituted an adverse employment action, the question is whether Plaintiff engaged in a protected activity; if he did, whether Defendants knew of it; and, if so, whether there was a causal connection between the protected activity and his termination.

To establish the first of these elements, Plaintiff need not prove that the conditions against which he protested actually amounted to a violation of Title VII. *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999) (citing *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)). Rather, Plaintiff must demonstrate only that he had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.*, quoting *Manoharan*, 842 F.2d at 593 (quotation omitted).

*McMenemy v. City of Rochester*, 241 F.3d 279 (2d Cir. 2001) holds that a Title VII retaliation claim may be stated where the plaintiff reports the actions of third parties with no employment relationship to either plaintiff or defendant. In *McMenemy*, the plaintiff reported the sexual harassment of a secretary by her employer, the president of

29

plaintiff's union. According to plaintiff, he was denied a promotion after making the report.

The District Court held that plaintiff had engaged in no activity protected by Title VII, as here, and dismissed the retaliation claim. On appeal, this Court reversed and reinstated the claim for Title VII retaliation.

A valid claim of retaliation was held to have been stated, despite the fact that neither party to the alleged harassment were in an employment relationship with the plaintiff or the defendant. The focus in determining the viability of the "protected activity" prong of a retaliation claim, must be on whether or not the acts reported by the plaintiff constitute conduct prohibited by Title VII. If the conduct is unlawful under Title VII, a complaint about such conduct appears to constitute activity protected by the statute. If, on the other hand, the conduct complained about does not violate Title VII, no retaliation claim is stated. *McMenemy* holds that this remains true even in retaliation cases where the plaintiff has objected to the conduct of one with whom he has absolutely no employment relationship.

The district court misunderstood the concept of protected activity

30

citing cases whose factual matrix were quite different. A protected

activity is an "action taken to protest or oppose statutorily prohibited

discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir.

2019) (quotations omitted). Protected activity under Title VII includes

"informal protests of discriminatory employment practices" such as

"making complaints to management [or] protesting against

discrimination by industry or by society in general." *Littlejohn v. City of

New York*, 795 F.3d 297, 317 (2d Cir. 2015). Thus, "advocacy on behalf of

special education students constitutes protected activity under . . . the

Rehabilitation Act." *Lopez v. New York City Dep't of Educ.*, No. 17 Civ.

9205 (RA), 2020 WL 4340947, at *11 (S.D.N.Y. July 28, 2020); accord

*Manigaulte v. C.W. Post of Long Is. Univ.*, 659 F. Supp. 2d 367, 375

(E.D.N.Y. 2009) ("[A] non-disabled individual who files a complaint of

disability discrimination is engaging in activity protected under the

ADA.")

    Plaintiff's advocacy for the religious rights of his clients clearly

qualifies. The district court failed to recognize: "Unlike under Title VII's

anti-discrimination provision, no component of the anti-retaliation

31

provision requires that the employer have taken action against the employee *because of* that employee's race, color, religion, sex, or national origin but rather that the employer have taken action because the employee—regardless of race, color, religion, sex, or national origin—opposed discrimination of anyone—including herself or others or both—on the basis of that person or persons' race, color, religion, sex, or national origin." *Finn v. Kent Sec. Servs., Inc.*, 981 F. Supp. 2d 1293, 1299 (S.D. Fla. 2013). "A plaintiff stating a claim for retaliation need not show that he or she was also the target of the underlying discrimination." *Piper v. Metro Sols., LLC*, No. 818CV3038TTPBJSS, 2021 WL 1341460, at *5 (M.D. Fla. Feb. 16, 2021), report and recommendation adopted, No. 8:18-CV-3038-TPB-JSS, 2021 WL 1050140 (M.D. Fla. Mar. 19, 2021). See also *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (employee engages in protected activity when she voices complaints of race, color, sex, religion, or national origin discrimination to her employer)

There is more than sufficient evidence here to create a question of fact. The Rabbi's affidavit is sufficient in and of itself on that score. See

32

A533-A534. As the Rabbi explains, the Plaintiff's "working conditions have grown intolerable after at the coffee house throughout the time of Sukkot his supervisor was chasing him across the room from one table to another holding her phone in front of his face. The supervisor was berating him for bringing the Arba Minim (fourplants) symbolizing unity and letting Holocaust survivors touch it or hold in their hands. . . [¶]When I followed up later, Oleg stated that after reporting his supervisor's harassment to the director of RHSP his employment has been terminated on the very same day." A534.

Although defendant has offered non-discriminatory reasons for the termination, at this stage, "plaintiff may, depending on how strong it is, rely upon the same evidence that comprised [his] prima facie case, without more" to establish that these reasons are pretextual. *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004). This is the case here.

Plaintiff's affidavit, discussed at above at pages 21-22, are sufficient to show that the purported legitimate reasons given by  There is sufficient evidence for the retaliation claims to be submitted to a jury.

## C. Religious Discrimination: "Same Actor" Inference Inapplicable

To make out a case of religious discrimination under Title VII and NYSHRL, a plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for her position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 83 (2d Cir. 2015); see also *Lowman v. NVI LLC*, 821 F. App'x 29, 31 (2d Cir. 2020).

Plaintiff has undoubtedly established each of these elements. See *Kugel v. Queens Nassau Nursing Home*, 568 F. Supp. 3d 253 (E.D.N.Y. 2021). He is a member of a protected class, as a licensed social worker, he is qualified for the position, A551 (100% on State Social Worker examination), he was terminated from employment, and the circumstances– his various complaints– give rise to an inference of discrimination. Once again, Rabbi Lekht's affidavit details many of these circumstances and shows why they are offensive. A532-A535. It "caused emotional distress and was extremely outrageous." A535.

The district court erred in relying on the "same actor" inference in

34

concluding that he failed to adduce adequate proof of religious discrimination. "That rationale is that when the person who made the decision to fire was the same person who made the decision to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute to him an invidious firing motivation that would be inconsistent with his decision to hire. See, e.g., *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). This rationale has usually been applied in circumstances where the person making the hiring decision had no collateral incentive to hire any particular candidate." *Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003).

More important, "the same-actor inference is permissive, not mandatory." *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009). "The 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999).

Unfortunately, that is precisely what the district court did here.

35

"In light of [the] numerous alleged discriminatory comments, [the district court's] reliance on the same-actor doctrine seems particularly inappropriate in this case. In any event, even if such an inference were warranted, it still would 'not [be] sufficient in itself to justify summary judgment [because Plaintiff] has otherwise raised . . . genuine issue[s] of material fact.'" *O'Diah v. Oasis*, 954 F. Supp. 2d 261, 275 (S.D.N.Y. 2013) (quoting *Castagna v. Luceno*, 2013 U.S. Dist. LEXIS 14932, 2013 WL 440689, at *4 n.8 (S.D.N.Y. Feb. 4, 2013)).

The inference is not dispositive where others—notably, the inference of discrimination that can be drawn from the anti-Semetic slurs—strongly cut the other way. See *Grady*, 130 F.3d at 560 ("[E]ach case must involve an examination of all the circumstances."); *Bookman v. Merrill Lynch*, No. 02 Civ. 1108 (RJS), 2009 U.S. Dist. LEXIS 40766, 2009 WL 1360673, at *14 (S.D.N.Y. May 14, 2009); *Copeland*,  38 F. Supp. 2d at 305. In addition, there was not a single actor. Defendant conceded: "Together, Byrne, Woolley, DeOssie and Khachatryan decided to terminate Plaintiff's employment." A521. It is undisputed that both Woolley and Khachatryan were involved in the decision to terminate

36

Plaintiff's employment. A521. These considerations substantially

vitiate the same actor inference.

Rabbi Lekht has set forth some of the circumstances regarding the

discrimination. There are so many others.

For example, Plaintiff requested time off for the Jewish holidays,

Woolley informed him that Selfhelp already gave its employees Rosh

Hashanah and Yom Kippur off, even though Plaintiff needed time off for

additional Jewish holidays around that time. A482. Woolley acceded to

his "request only after [he] repeatedly said that [he] was not allowed to

work on Jewish holidays, and she left [Plaintiff] no choice but to quit

[his] job." A579, A482.

While Plaintiff "was out of the office for a religious observance" on

October 12 and 13, 2017, Woolley "bull[ied]" him on October 12 and 13,

2017 when she "called [his] clients for the purpose of soliciting

complaints with the intention to damage [his] reputation." A572.

Plainly, this creates a question of fact.

Defendant has purported to offer non-discriminatory reasons for

the discharge. Thus, this Court must "examine the record as a whole,

just as a jury would, to determine whether a jury could reasonably find

37

an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell Bd. Of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). At this stage of the Title VII analysis, "the presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000).

"[T]o defeat summary judgment . . . the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (internal quotation marks and citations omitted).

"To meet [the ] ... ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Id.* at 124 (internal quotation marks and citation omitted).

Again, this is such a case. As explained in Plaintiff's affidavit,

38

discussed above, page 21, there is ample evidence that the complaints
against him were specious and that the reasons given for termination
were pretextual. Moreover, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct.
2407 (2022) rejects any reliance upon an Establishment Clause claim
made by Defendant below.

With respect to the claim under the NYCHL, there is no question
that are analyzed under a broader standard than claims brought under
Title VII." *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 522
(S.D.N.Y. 2019) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am.,
Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)). To state a discrimination claim
under the NYCHRL, "the plaintiff need only show that [the] employer
treated [him] less well, at least in part for a discriminatory reason."
*Mihalik*, 715 F.3d at 110 n.8.

Contrary to the finding of the district court, at the very least, the
record demonstrates an issue of fact on that score. Indeed, the Supreme
Court's analysis in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407
(2022), if anything, adds to analysis on that score.

39

## D. Hostile Work Environment

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks omitted); see also *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (applying the same standard under § 1983).

Courts consider "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera*, 743 F.3d at 20 (internal quotation marks and alterations omitted).

In order to survive a summary judgment motion with respect to a claim of a hostile work environment, a plaintiff must provide sufficient

40

evidence to create a genuine question of fact as to whether "[his]
workplace is permeated with discriminatory intimidation, ridicule, and
insult, that is sufficiently severe or pervasive to alter the conditions of
[his] employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)
(internal quotation marks and citation omitted). The hostility or
harassment must be on account of his religion, and his employer must
be responsible for the discriminatory conduct. See *Gregory v. Daly*, 243
F.3d 687, 692 & n. 3 (2d Cir.2001).

　　While there is no bright-line test as to the type of conduct that is
required to give rise to a hostile work environment claim against an
employer, we consider the following factors, which are not exclusive:
"the frequency of the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive utterance;
and whether it unreasonably interferes with an employee's work
performance." *Harris*, 510 U.S. at 22–23.

　　Examining the evidence in the light most favorable to Plaintiff, the
evidence he presents concerning interactions with his supervisors are
sufficient to express "hatred, contempt, or hostility," so as to create a

41

hostile work environment. *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004) (anti-Semitic comments sufficient to withstand summary judgment). Perhaps, when viewed individually each of the discriminatory actions for which Plaintiff provides evidence may not allow a reasonable trier of fact to conclude based on that act alone that he was subjected to a hostile work environment. When viewed in toto, however, drawing all reasonable inferences in his favor, there is a genuine issue of fact whether the acts in question had an adverse effect on, or altered the conditions of, his employment. See *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir.2004) ("The matter of whether the conduct alleged was so severe or pervasive as to create an objectively hostile or abusive work environment is to be decided based on the totality of the circumstances." (internal quotation marks omitted); *Feingold*; *Leifer v. New York State Div. of Parole*, 391 F. App'x 32, 35–36 (2d Cir. 2010).

The frequency and severity of harassment demonstrated in prior cases does not mandate a specific level of harassment that future plaintiffs must demonstrate to avoid summary judgment against them.

42

See *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 606 (2d

Cir.2006) ("Prior cases in which we have concluded that a reasonable

juror could find that the work environment was objectively hostile do

not establish a baseline that subsequent plaintiffs must reach in order

to prevail." (internal quotation marks and citation omitted)).

On the record presented in this case, Plaintiff has proffered

sufficient evidence to establish a genuine issue of material fact

concerning his hostile work environment claim, and that claim should

be presented to a jury. See, e.g., *Patterson*, 375 F.3d at 227 ("Where

reasonable jurors could disagree as to whether alleged incidents of ...

harassment would have adversely altered the working conditions of a

reasonable employee, the issue of whether a hostile work environment

existed may not properly be decided as a matter of law."); see also

*Feingold*; *Schiano*, 445 F.3d at 605 ("[H]ostile work environment claims

present mixed questions of law and fact that are especially well-suited

for jury determination." (internal quotation marks omitted))

43

The district court's grant of summary judgment in favor of defendants with respect to Plaintiff's hostile work environment claim was error. See *Feingold*; *Leifer v. New York State Div. of Parole*, 391 F. App'x 32, 37 (2d Cir. 2010).

## Conclusion

For the reasons expressed, the judgment should be reversed

insofar appealed from, and the matter remanded for trial.

Dated: July 22, 2022                          /s/ Oleg Gerzhgorin

## Certificate of Service

I hereby certify under penalty of perjury that on July ___, 2022, I

served a copy of the Appellant's Brief by email upon

Diane Krebs
Jackson Lewis P.C.
58 South Service Road
Suite 250
Melville, NY 11747
631-247-0404
Fax: 631-247-0417
Email: Diane.Krebs@jacksonlewis.com


Dated: July 25 2022

/s/ Oleg Gerzhgorin
[Pro Se]

46

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 8,183 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6)

Dated: July 2*4* 2022

/s/ Oleg Gerzhgorin
[Pro Se]

OUTSIDE THE BOX SHIPPING
7183001300
OUTSIDE THE BOX SHIPPING
1820 AVENUE M
BROOKLYN NY 11230

DWT: 16,14,10

SHIP TO:
US COURT OF APPEALS FOR THE SECOND
CLERKS OFFICE — THURGOOD MARSHALL U
40 FOLEY SQ
NEW YORK  NY  10007



**NY 102 9 – 10**

## JPS GROUND

RACKING #: 1Z 033 6F2 03 9599 2497

LLING: P/P

ᴋ Ref No.: PM PKG ID 435241
ᴋ Ref No.: FROM OLEG GERZHGORIN

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.