# 22-0808-cv

# United States Court of Appeals
## *for the*
## Second Circuit

OLEG GERZHGORIN,

*Plaintiff-Appellant,*

– v. –

SELFHELP COMMUNITY SERVICES, INC., RUSSIAN HOLOCAUST
SURVIVORS PROGRAM,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

DIANE KREBS
JACKSON LEWIS P.C.
*Attorney for Defendants-Appellees*
58 South Service Road, Suite 250
Melville, New York 11747
(631) 247-0404

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned attorneys of record for Defendant-Appellee Selfhelp Community Services, Inc. ("Selfhelp"), a private non-governmental party, certify that Selfhelp has no parent company and that no publicly-owned corporation owns 10% or more of its stock.[1]

---

[1] Defendant-Appellee Russian Holocaust Survivors Program ("RHSP") is not a separate entity, but rather is one of the services/programs provided by Selfhelp. (A463 n.1). It therefore is not a properly named defendant-appellee. To the extent a Rule 26.1 statement is nevertheless required for it, it is included in Selfhelp's response, and RHSP and Selfhelp will collectively be referred to as "Appellees."

# **TABLE OF CONTENTS**

**PAGE(S)**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

JURISDICTIONAL STATEMENT ...........................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED FOR
REVIEW ....................................................................................................1

ORAL ARGUMENT NEED NOT BE PERMITTED ........................................3

COUNTER-STATEMENT OF THE CASE ...................................................4

    I.      STATEMENT OF RELEVANT FACTS ...................................4

         A.    About the Parties..............................................................4

         B.    Appellant's Hire................................................................6

         C.    Appellant's Performance Issues.......................................9

         D.    Addressing Appellant's Performance Issues ................11

         E.    Appellant's Termination .................................................13

         F.    Appellant's Alleged Evidence of Religious
             Discrimination.................................................................13

         G.    Appellant's Alleged Evidence of Retaliation ................18

    II.     PROCEDURAL HISTORY AND RULINGS FOR
         REVIEW ........................................................................21

SUMMARY OF THE ARGUMENT .......................................................23

ARGUMENT ....................................................................................26

    I.      STANDARD OF REVIEW .......................................................26

    II.     THE DISTRICT COURT PROPERLY DISMISSED
         APPELLANT'S CLAIMS OF RELIGIOUS
         DISCRIMINATION.................................................................27

# TABLE OF CONTENTS (CONTD.)

PAGE(S)

    A.    Appellant Did Not Even Establish a *Prima Facie* Case of Religious Discrimination ................................................27

    B.    Selfhelp Has Articulated Legitimate, Nondiscriminatory Reasons For Its Actions, and There Is No Evidence These Reasons are Pretextual ..................37

III.    THE DISTRICT COURT PROPERLY DISMISSED APPELLANT'S CLAIMS OF RETALIATION ....................................45

    A.    Appellant Failed To Identify Any Protected Activity In Which He Engaged, And Thus The District Court Properly Concluded He Could Not Establish A *Prima Facie* Case of Retaliation................................................45

    B.    Appellant Failed To, And Cannot, Rebut Selfhelp's Legitimate, Nonretaliatory Business Reasons for Termination ....................................................................52

IV.    THE DISTRICT COURT PROPERLY DISMISSED APPELLANT'S FAR-TOO-LATE ASSERTED CLAIMS OF HOSTILE WORK ENIRONMENT ................................53

    A.    Appellant Never Asserted A Hostile Work Environment Claim Until He Made Objections To The R&R, Which Is Too Late ................................53

    B.    Even If One Were To Consider *Arguendo* Appellant's Hostile Work Environment Claim On The Merits, The District Court Properly Dismissed It ....................................57

CONCLUSION .........................................................................................62

CERTIFICATE OF COMPLIANCE UNDER FRAP 32(g)(1) ................................63

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
  239 F.3d 456 (2d Cir. 2001) ...............................................................26

*Adam v. Glen Cove School*,
  No. 06-CV-1200 (JFB), 2008 U.S. Dist. LEXIS 13039 (E.D.N.Y.
  Feb. 21, 2008) ....................................................................................32

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 252 (1986).....................................................................26

*Aslanidis v. United States Lines, Inc.*,
  7 F.3d 1067 (2d Cir. 1993) ..................................................................27

*Avillan v. Donahoe*,
  483 Fed. Appx. 637 (2d Cir. 2012).......................................................55

*Burns v. Medgar Evers Coll. of the City Univ. of N.Y.*,
  No. 19-cv-1211 (BMC)(JO), 2019 U.S. Dist. LEXIS 136879
  (E.D.N.Y. Aug. 19, 2019).....................................................................27

*Byrnie v. Town of Cromwell Bd. of Educ.*,
  243 F.3d 93 (2d Cir. 2001) ..................................................................43

*Chiara v. Town of New Castle*,
  126 A.D.3d 111 (2d Dep't 2015).........................................................61

*Danzer v. Norden Sys., Inc.*,
  151 F.3d 50 (2d. Cir. 1998) .................................................................32

*Dawson v Bumble & Bumble*,
  246 F. Supp. 2d 301 (S.D.N.Y. 2003), *aff'd*, 398 F.3d 211 (2d Cir.
  2005) .............................................................................................. 42-43

*Delaney v Bank of Am. Corp.*,
  766 F.3d 163 (2d Cir. 2014) ................................................................43

iv

# <u>TABLE OF AUTHORITIES (CONTD.)</u>

**Page(s)**

*Distasio v. Perkin Elmer Corp.*,
  157 F.3d 55 (2d Cir. 1998) ...............................................................26

*Ennis v. Sonitrol Mgmt. Corp.*,
  No. 02-CV-9070 (TPG), 2006 U.S. Dist. LEXIS 2599 (S.D.N.Y.
  Jan. 25, 2006) ..................................................................................61

*Fashakin v. Nextel Communs.*,
  No. 05-cv-3080 (RRM), 2009 U.S. Dist. LEXIS 25140 (E.D.N.Y.
  Mar. 25, 2009) .................................................................................59

*Ferraro v. New York City Dep't of Educ.*,
  752 Fed. Appx. 70 (2d Cir. 2018) ...................................................41

*Garcia v. Scheiderman*,
  No. 16-CV-2584 (ALC), 2019 U.S. Dist. LEXIS 172791
  (S.D.N.Y. Oct. 4, 2019) ..................................................................56

*Grady v. Affiliated Central, Inc.*,
  130 F.3d 553 (2d Cir. 1997) ...........................................................28

*Greenidge v. Allstate Ins. Co.*,
  446 F.3d 356 (2d Cir. 2006) ...........................................................55

*Hess v. Mid Hudson Valley StaffCo LLC*,
  776 Fed. Appx. 36 (2d Cir. 2019) ...................................................39

*Holt v. KMI-Continental, Inc.*,
  95 F.3d 123 (2d Cir. 1996) .............................................................43

*I.T. v. N.Y.C. Dep't of Educ.*,
  15-cv-3894 (WFK), 2020 U.S. Dist. LEXIS 133614 (E.D.N.Y.
  July 14, 2020) ..................................................................................59

*Irish v. Tropical Emerald LLC*,
  No. 18-CV-82 (PKC) (SJB), 2022 U.S. Dist. LEXIS 124043
  (E.D.N.Y. Jul. 13, 2022) .................................................................55

*Jeffreys v. The City of New York*,
  426 F.3d 549 (2d Cir. 2005) ......................................................26, 27

v

# TABLE OF AUTHORITIES (CONTD.)

**Page(s)**

*John v. Kingsbrook Jewish Med. Ctr. / Rutland Nursing Home*,
    No. 11 Civ. 3624 (MKB), 2014 U.S. Dist. LEXIS 39322 (E.D.N.Y.
    Mar. 25, 2014), *aff'd*, 598 Fed. Appx. 798 (2d Cir. 2015) ........................... 45-46

*Jones v. Yonkers Pub. Schs*,
    326 F. Supp. 2d 536 (S.D.N.Y. 2004) ................................................................29

*Kemp v. A & J Produce Corp.*,
    164 Fed. Appx. 12 (2d Cir. 2005) ......................................................................40

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ......................................................................................41

*Kennedy v. J.P. Morgan Chase & Co.*,
    325 F. Supp. 2d 401 (S.D.N.Y. 2004) ..............................................................59

*Kerman-Mastour v. Fin. Indus. Regulatory Auth.*,
    814 F. Supp. 2d 355 (S.D.N.Y. 2011) ..............................................................32

*Klestadt v. Duncan*,
    No. 14-CV-2831 (NGG) (LB), 2016 U.S. Dist. LEXIS 24026
    (E.D.N.Y. Feb. 26, 2016) ...................................................................................46

*Legg v. Ulster Cty.*,
    979 F.3d 101 (2d Cir. 2020) ..............................................................................58

*Leibovitz v. New York City Transit Auth.*,
    252 F.3d 179 (2d Cir. 2001) ..............................................................................60

*Lewis v. N. Gen. Hosp.*,
    502 F. Supp. 2d 390 (S.D.N.Y. 2007) ..............................................................61

*Lizado v. Denny's, Inc.*,
    270 F.3d 94 (2d Cir. 2001) ................................................................................36

*Lopez v. New York City Dep't of Educ.*,
    No. 17-CV-9205 (RA), 2020 U.S. Dist. LEXIS 133548 (S.D.N.Y.
    Jul. 28, 2020) ......................................................................................................49

# TABLE OF AUTHORITIES (CONTD.)

**Page(s)**

*Magnusson v. County of Suffolk*,
    No. 14-CV-3449 (SJF)(ARL), 2016 U.S. Dist. LEXIS 64897
    (E.D.N.Y. May 17, 2016) ...................................................................58

*Malaney v. El Al Isr. Airlines*,
    331 Fed. Appx. 772 (2d Cir. 2009) ....................................................46

*Manigaulte v. C.W. Post of Long Is. Univ.*,
    659 F. Supp. 2d 367 (E.D.N.Y. 2009) ...............................................50

*Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*,
    842 F.2d 590 (2d Cir. 1988) ........................................................45, 46

*Mario v. P&C Food Markets, Inc.*,
    313 F.3d 758 (2d Cir. 2002) ...............................................................26

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................27

*McGullam v. Cedar Graphics, Inc.*,
    609 F.3d 70 (2d Cir. 2010) .................................................................57

*McMenemy v. City of Rochester*,
    241 F.3d 279 (2d Cir. 2001) ........................................................48, 49

*Meiri v. Dacon*,
    759 F.2d 989 (2d Cir. 1985) ...............................................................40

*Mikhaylov v. Y & B Transp. Co.*,
    No. 15-CV-7109 (DLI) (VMS), 2019 U.S. Dist. LEXIS 59203
    (E.D.N.Y. Mar. 31, 2019) ...................................................................60

*Montanez v. McDean LLC*,
    770 F. Appx. 592 (2d Cir. 2019) ........................................................52

*Murray v. Visiting Nurse Servs. of N.Y.*,
    528 F. Supp. 2d 257 (S.D.N.Y. 2007) ...............................................52

*Nash v. Jacqueline Cochran, Inc.*,
    548 F. Supp. 676 (S.D.N.Y. 1982) ....................................................42

## <u>TABLE OF AUTHORITIES (CONTD.)</u>

**Page(s)**

*Natofsky v. City of New York*,
   921 F.3d 337 (2d Cir. 2019) ..............................................................51

*Neita v. Precision Pipeline Solutions*,
   No. CV 15-649 (JS) (AKT), 2018 U.S. Dist. LEXIS 32898
   (E.D.N.Y. Feb. 26, 2018)..................................................................47

*Oyewo v. Lahood*,
   515 Fed. Appx. 10 (2d Cir. 2013).....................................................55

*Pa. State Police v. Suders*,
   542 U.S. 129, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004) .................58

*Palmer v. Penfield Cent. Sch. Dist.*,
   918 F. Supp. 2d 192 (W.D.N.Y. 2013)..............................................47

*Peters v. Mount Sinai Hosp.*,
   No. 08 Civ. 7250 (CM), 2010 U.S. Dist. LEXIS 32884 (S.D.N.Y.
   2010) .............................................................................................43

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
   743 F.3d 11 (2d Cir. 2014) ..............................................................57

*Ruane v. Cont'l Cas. Co.*,
   No. 96 Civ. 7153 (LBS), 1998 U.S. Dist. LEXIS 8141 (S.D.N.Y.
   June 3, 1998)..................................................................................29

*Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*,
   183 F.3d 155 (2d Cir. 1999) ............................................................59

*Satterfield v. United States Parcel Service, Inc.*,
   No. 00 Civ. 7190 (MHD), 2003 U.S. Dist. LEXIS 17229
   (S.D.N.Y. Sept. 30, 2003)................................................................44

*Shah v. Helen Hayes Hosp.*,
   252 F. Appx. 364 (2d Cir. 2007) .....................................................55

*Sioson v. Knights of Columbus*,
   303 F.3d 458 (2d Cir. 2002) ............................................................41

## <u>TABLE OF AUTHORITIES (CONTD.)</u>

**Page(s)**

*Smith v. N.Y. & Presbyterian Hosp.*,
    2020 U.S. Dist. LEXIS 27243 (S.D.N.Y. Feb. 18, 2020) ..................................52

*Snowden v. Trs. of Columbia Univ.*,
    No. 12 Civ. 3095 (GBD), 2014 U.S. Dist. LEXIS 42543 (S.D.N.Y.
    March 26, 2014), *aff'd*, 612 Fed. Appx. 7 (2d Cir. 2015) ............................ 28-29

*Van Zant v. KLM Royal Dutch Airlines*,
    80 F.3d (2d Cir. 1996) ......................................................................44

*Volpe v. New York City Dep't of Educ.*,
    195 F. Supp. 3d 582 (S.D.N.Y. 2016) ..........................................................50, 51

*Watson v. Geithner*,
    Nos. 09 Civ. 6624 (HBP), 10 Civ. 3948 (HBP), 10 Civ. 7282
    (HBP), 2013 U.S. Dist. LEXIS 139673 (S.D.N.Y. Sept. 27, 2013)...................40

*Weber v. City of New York*,
    973 F. Supp. 2d 227 (E.D.N.Y. 2013) ........................................................ 31-32

*Williams v. Home Depot U.S.A., Inc.*,
    02 Civ. 5353 (DAB), 2005 U.S. Dist. LEXIS 22254 (S.D.N.Y.
    Sept. 30, 2005), *aff'd*, 2006 U.S. App. LEXIS 24064 (2d. Cir. Sept.
    19, 2006) ......................................................................................46

*Wimmer v. Suffolk County Police Dep't*,
    176 F.3d 125 (2d Cir. 1999) ..............................................................47

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) ..............................................................55

*Zann Kwan v. Andalex Group LLC*,
    737 F.3d 834 (2d Cir. 2013) ..............................................................53

## Statutes

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

# TABLE OF AUTHORITIES (CONTD.)

**Page(s)**

28 U.S.C. § 1367 ....................................................................1

29 U.S.C. § 794 ...................................................................49

Age Discrimination in Employment Act ................................21

Americans with Disabilities Act ...........................................50

New York City Human Rights Law/CHRL...................*passim*

Rehabilitation Act ..........................................................49, 50

Title VII of the Civil Rights Act of 1964......................*passim*

**Other Authorities**

Fed. R. App. P. 26.1 ................................................................i

Fed. R. App. P. 32 .................................................................63

Fed. R. App. P. 34 ..................................................................3

Fed. R. Evid. 801(c) ..............................................................59

Local App. Rule 32.1 ............................................................63

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of New York had jurisdiction over *pro se* Plaintiff-Appellant Oleg Gerzhgorin's ("Appellant" or "Gerzhgorin") federal law claims pursuant to 28 U.S.C. § 1331, and it exercised pendent jurisdiction over Gerzhgorin's city law claims pursuant to 28 U.S.C. § 1367.

Judge LaShann DeArcy Hall granted summary judgment, thereby dismissing Gerzhgorin's entire Complaint, by Memorandum and Order Adopting Report and Recommendation dated March 29, 2022 ("M&O"), which adopted the Report and Recommendation of Magistrate Judge Peggy Kuo, dated March 2, 2021 ("R&R"). Gerzhgorin timely filed notice of appeal of the M&O on or about April 12, 2022, which gives this Court jurisdiction pursuant to 28 U.S.C. § 1291.

## COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the District Court, in its M&O, correctly grant summary judgment dismissing Gerzhgorin's religious discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("CHRL"), where Gerzhgorin failed to establish a *prima facie* case, and in any event, Appellees offered legitimate, non-discriminatory reasons for their actions that Gerzhgorin failed to demonstrate as pretext?

This question should be answered in the affirmative.

2.      Did the District Court, in its M&O, correctly grant summary judgment dismissing Gerzhgorin's retaliation claims under Title VII and the CHRL, where the only protected activity alleged pertained to complaints <u>not</u> about "employment practices," which is not covered by the statutes at issue, and in any event, Appellees offered legitimate, non-retaliatory reasons for their actions that Gerzhgorin failed to demonstrate as pretext?

This question should be answered in the affirmative.

3.      Did the District Court, in its M&O, correctly conclude that (a) Gerzhgorin never attempted to assert a claim for harassment under Title VII or the CHRL until his filed objections to the R&R, (b) it was too late to attempt to assert such a claim at that time, and in any event (c) Gerzhgorin failed to substantively support any such claim?

This question should be answered in the affirmative.

## **ORAL ARGUMENT NEED NOT BE PERMITTED**

Pursuant to Rules 34(a)(1) and (2) of the Federal Rules of Appellate Procedure, oral argument need not be heard in this case because the appeal is frivolous, and the dispositive issues have authoritatively been decided.

This appeal is frivolous because it does not point to any errors, factual or legal, made below. Indeed, the appeal barely refers to Magistrate Judge Kuo's comprehensive 38-page R&R or Judge DeArcy Hall's 17-page M&O. Rather, Gerzhgorin primarily seeks simply to reprise arguments previously made below, or to introduce new legal arguments not raised below, which is entirely impermissible as well as unsupported by the case law.

The renewed arguments raised here, which are primarily duplicative of arguments rejected by the court below, have authoritatively been decided. Magistrate Judge Kuo's exhaustive R&R is replete with citations to applicable legal authority that is not in dispute. Judge DeArcy Hall, too, relies on legal authority that is widely accepted as the law in this jurisdiction.

Given the frivolous nature of the appeal and the lack of any legal issues that have not already been authoritatively decided in this Circuit, this Court need not entertain oral argument.

## COUNTER-STATEMENT OF THE CASE

### I.   STATEMENT OF RELEVANT FACTS

For a full recitation of the facts, Appellees refer the Court to their primary and rebuttal Statements of Undisputed Facts Pursuant to Local Rule 56.1, both filed in connection with their underlying motion for summary judgment.  (A463-525; SUA1-62).  Key factual highlights are recited immediately below.[2]

### A.   About the Parties

Selfhelp was founded in 1936 by a group of German émigrés to help newly arriving European Jewish refugees fleeing from Nazi persecution establish themselves in America while maintaining their independence and dignity.  Today, it is one of the largest and most respected not-for-profit human service agencies in the New York metropolitan area, with 46 programs throughout New York City and Long Island and serving more than 20,000 elderly, frail, and at-risk New Yorkers each year, including more than 4,500 Holocaust survivors.  (A463-64).

One of Selfhelp's programs is RHSP, a subset of its Holocaust Survivor Program.  Selfhelp continues to serve its mission of being the "last surviving relative" to Holocaust victims.  Specifically regarding RHSP, Russian-speaking

---

[2]   When Appellees cite to their Rule 56.1 Statements, those cites incorporate by reference all the documents upon which Appellants relied in preparing those Statements, which are cited therein and also are a part of the record on appeal.

Holocaust survivors from the former Soviet Union ("FSU") are the fastest growing population of survivors served by Selfhelp and have distinct needs. Each year RHSP provides more than 1,000 Russian survivors with enhanced case management, social programs, and referrals for key services. Through the support of the Conference on Jewish Material Claims Against Germany ("Claims Conference"), UJA-Federation of New York's Community Initiative for Holocaust Survivors, the Jewish Federations of North America, and many governmental and private supporters, Selfhelp is able to provide these high-quality services to the survivors in their care. (A464-66).

But Selfhelp is not a religious institution, and because it receives federal grant money, it may not use those funds to support "explicitly religious activities, such as worship, religious instruction, or proselytization." (A466). Thus, while RHSP can engage in cultural events relating to Judaism, it cannot practice religious principles or allow religious tenets to guide how it assists clients in the provision of social services. (*Id.*).

The Director of RHSP is Mariam Khachatryan ("Khachatryan"). Khachatryan began working at Selfhelp in or around September 2003. She has worked with Russian Holocaust survivors since in or about December 2006, and she has been the Director of RHSP since February 2014. Khachatryan is not Jewish. (A467).

Selfhelp maintains a policy against discrimination in its Policies and Procedures Manual ("Manual"). Selfhelp will not tolerate any form of discrimination or retaliation and is devoted to creating a work environment free of any such conduct. In addition, the Manual contains an open door policy and maintains an established and comprehensive Internal Complaint Procedure, with multiple avenues of complaint. (A467-68).

Gerzhgorin was born in Belarus, in the FSU. He emigrated to the United States, and specifically to New York, in 1995. After getting his master's degree in social work, he received a social work license in 2015. Appellant self-identifies as an Orthodox Jew. (A469).

### B.    Appellant's Hire

Appellant applied for a social worker position within RHSP on the Selfhelp website by completing an application and submitting a resume on or about May 26, 2017.[3]   His resume reflected his being a descendant of Holocaust survivors. Gerzhgorin was called in for an interview, initially with Human Resources and then with Khachatryan. He wore a yarmulke to his interviews, making it obvious he was an observant Jew. (A470).

After interviewing Appellant, Khachatryan made the decision to hire him for the position. (A471). Gerzhgorin acknowledges and concedes that Khachatryan

---

[3]    Unless otherwise specified, all dates hereafter are in 2017.

knew he was an Orthodox Jew at the time she decided to extend him a job offer. (Plaintiff-Appellant's Brief on Appeal ("App. Br.") at 5).

Gerzhgorin began working at Appellees on July 3, subject to a six-month probationary period. His immediate supervisor was Fakhriniso "Fahry" Woolley ("Woolley"). Appellant was given new employee onboarding training and orientation, including but not limited to the Manual, a job description (which he executed), a new hire packet, and hands-on training. Appellees also took steps to make Gerzhgorin feel welcome. (A471-72).

Gerzhgorin, like all social workers at RHSP, had a variety of obligations with which he had to comply – many of which were in writing, but others of which were conveyed verbally. (A473). Some key responsibilities included:

- Conducting 15-20 home visits each month with assigned clients, ensuring each client received a home visit once every six months and clients newly assigned to a worker received a home visit within the first 3-5 days. For new workers like Gerzhgorin, who received a large new caseload upon hire, conducting home visits within that time frame would have been unrealistic. Accordingly, Gerzhgorin was told he needed to make a home visit to each assigned client within the first 2.5 months of his employment. (A473-74).

7

- Making contact with each assigned client at least once per month to check on their status. If a worker was unable to reach a client, there were internal notification protocols to follow. (A474-75).

- Assisting clients with securing services, benefits, and entitlements as needed from a variety of sources. There were time frames applicable for almost every item a client might seek to obtain (whether for the initial application or an appeal of a decision). If those time frames were not met, multiple negative repercussions could occur. Some of these efforts could be considered an "emergency situation." (A475-77).

- Attending and interacting with clients at monthly "coffee houses" – social events providing food, music, and social interaction for clients – and participating in various ways in the planning and preparation for these coffee houses (*e.g.*: notifying and inviting clients each month; assisting with set-up). (A477-78).

- Recording detailed case notes in each client's file regarding each interaction, their needs, and efforts to assist them. Case notes are extremely important because they, *inter alia*, assist in planning for service and treatment, protect practitioners against allegations, and provide up to date information for workers and other staff. Every

visit, contact, or communication with the client or someone regarding the client must be documented properly in a case note. That record had to be created as soon as possible after the event occurred. Moreover, there were specific rules about the content for each case note, *e.g.*, they must be objective, state facts, and not include judgments formed by the worker. (A478-81).

## C.    Appellant's Performance Issues

Despite the fact that Gerzhgorin's job duties were very clearly laid out for him, he fell down in his responsibilities in multiple ways. For example:

- Gerzhgorin failed to make monthly contact with each of his clients, missing contacts with at least 18 of his 42 clients in one or more months. Moreover, Gerzhgorin tried but failed to reach at least two of these clients, rendering them "missing" for purposes of contact, but he did not notify his supervisor. (A483-86).

- Although he was required to conduct a home visit with all his clients by the end of his first 2.5 months of employment, as of his three month anniversary, Gerzhgorin had failed to visit approximately *25* clients. (A486-88).

- Gerzhgorin failed to return calls from or on behalf of clients on multiple occasions (or alternatively failed to record any such return calls in his case notes).  (A488-89).

- On multiple occasions, Appellant failed to timely follow up on a client request or emergency situation.  (A490-92).

- Gerzhgorin repeatedly recorded case notes without sufficient substantive information such that a reader would be able to understand what had happened and/or had been discussed or observed with respect to the client, what services had been provided, and/or the plan of action.  He also failed to record every contact with the client or someone else relating to the client, deciding independently that only "important" events needed to be recorded, however he defined that.  (A480, A492-94).

- Gerzhgorin repeatedly failed to make his required calls to invite his clients to a coffee house, and on at least two occasions, his case notes claimed such a call had been made, but the client complained they had not received one.  (A495-97).

- Appellant often absented himself from coffee houses by failing to show up in advance as required to set up, leaving early, and remaining

in the kitchen when he was there, instead of mingling with clients. (A497-98).[4]

Notably, while Gerzhgorin may dispute the importance of, or may claim to have a rationale for, these many deficiencies, he never disputes the facts underlying these deficiencies as described above, and he actually concedes many of them. (*See, e.g.*, App. Br. at 19-21).

## D. Addressing Appellant's Performance Issues

After Woolley received multiple complaints about Gerzhgorin from clients or their family members in a relatively short period of time, accompanied at times by a request to switch to a different social worker, this red flag caused Woolley to audit his client files and case notes.[5] She discovered many significant performance problems and non-compliance with required work standards. (A499-502). Accordingly, after consulting with Khachatryan, Woolley met with Gerzhgorin on October 3 to discuss many of these issues and counsel him on his immediate

---

[4]     Regarding remaining in the kitchen, Gerzhgorin claims he did so because staff was not being careful with observing the laws of keeping kosher, and so he decided on his own to monitor the food service process. (A498). But setting aside any other issues with this self-appointment, Appellant's absence continued even after the food was served. (*Id.*).

[5]     Gerzhgorin claims Woolley solicited the complaints, rather than just receiving them. (App. Br. at 18). However, his only record support for that is A501-02, which is Appellees' Rule 56.1 statement, and that source makes clear Woolley merely received the complaints and did not solicit them (though she received one of the complaints when she called a client to check on his well-being (A499)).

required improvement. She then sent him an email the following day to memorialize the discussion (including itemizing the major issues she detected), remind him of the required standards and protocols, and identify the immediate steps she expected him to take to improve his performance. (A502).

When Gerzhgorin responded, he disputed almost none of the facts Woolley identified. Nevertheless, he implied there was a connection between this counseling and Appellant's email in which he raised alleged issues about cultural insensitivity to clients (his first "fresh look" email, as explained further below). (A502-03).[6]

Unfortunately, although Woolley laid out in detail the immediate expectations, Gerzhgorin failed to comply with them. For example: he did not contact one of the "missing" clients by the deadline set; he did not contact all individuals who had missed a contact in September by the deadline set; and he failed to catch up as instructed for the home visits to clients who had not yet received one. (A503-05).

---

[6] The uncontested existence of the October 3 counseling meeting and the follow-up October 4 counseling email demonstrates Appellant's assertions that he was never issued any "counseling memorandums" or "verbal warning notices" (App. Br. at 21) and "never saw any written warnings until he commenced this litigation" (App. Br. at 22) are patently false.

### E. Appellant's Termination

While Woolley was working with Gerzhgorin to improve his performance, she began drafting a formal disciplinary action form to memorialize the multitude of issues in a more official manner. After she sent her draft to Kevin Byrne, Selfhelp's then-Vice President of Human Resources & Labor Relations ("Byrne"), for his review and advice, Byrne inquired why Gerzhgorin was not being terminated instead of being issued a disciplinary notice. He included Khachatryan and Karen DeOssie ("DeOssie"), the Managing Director of Social Services and Khachatryan's direct supervisor, in the dialogue. (A520-21).

Together, Byrne, Woolley, DeOssie and Khachatryan decided to terminate Gerzhgorin's employment due to the plethora of issues with his performance. All these individuals believed termination was the appropriate step. This decision was finalized no later than October 16, and the plan was to hold the termination meeting with Appellant on October 17, which is what happened. (A521-22).

### F. Appellant's Alleged Evidence of Religious Discrimination

Appellant believes all was going well for the first two months of his employment; indeed, he called it a "honeymoon." He also complimented Woolley on her supervision after about one month of employment. Furthermore, he engaged in conduct that belie his current claims of religious discrimination. For example, he referred an Orthodox Jewish friend of his for possible employment in

RHSP, and he recommended the observant father of a longtime acquaintance of his (who was a rabbi) become a client of RHSP.  (A505).

Gerzhgorin claims Woolley applied somewhat different rules when she met with him in her office, as compared with other workers (who were not in their probationary periods as he was) – specifically, she always required the door to be closed, and his supervision sessions lasted longer than Woolley's meetings with others.  However, Appellant specified in his deposition he *did not believe* Woolley applied these different rules to his sessions due to his religion.  (A505-06).

Appellant also claims Woolley required him to carbon copy her on all emails, though he does not believe she required that of others (again, these "others" already had completed their probationary period).  Moreover, he admitted he did not ask Woolley about this requirement, nor did he ask any of his co-workers reporting to Woolley if they ever had to do this.  Had he done so, he would have learned Woolley had a general policy (including with her own supervisor, Khachatryan) to be copied on emails, so she could jump in on a case if needed.  In any event, Gerzhgorin acknowledged he *did not believe* Woolley placed this obligation on him because of his religion.  (A506-07).[7]

---

[7]    Although Appellant "believes" this requirement could constitute retaliation (App. Br. at 7; A507), he acknowledges it occurred before the first event he contends was protected activity (*see* Section G, *infra*).

Aside from these general conditions, Gerzhgorin identifies only a sprinkling of events or statements he claims demonstrates religious bias. First, at the end of August or beginning of September, Khachatryan organized an "end of summer" party, for which all staff members brought in food themselves and/or contributed funds toward the purchase of food. In one email, Khachatryan said generally she did not care about what the food was; Gerzhgorin interpreted that to mean that she did not care if he had kosher food and was "ridiculing" his observance of keeping kosher. (A507-08).

Second, he references an incident in which Woolley offered Gerzhgorin the opportunity to buy a bottle of kosher wine given to a social worker by a client, because she knew he was kosher and thought he might be interested in it. He agreed to purchase it for a few dollars. At some point thereafter, Woolley mentioned the purchase in an email to co-workers. Though Gerzhgorin could recall nothing specific about the content of the email, he nevertheless described it as humiliating. (A508).

Third, Woolley celebrated her birthday during Appellant's employment, and she held a birthday lunch at a non-kosher restaurant, to which all her subordinates were invited. Gerzhgorin declined, because he would not eat at a non-kosher restaurant. Gerzhgorin claims he was told by another employee "his values of kashrut observance were ridiculed at this party" and "people were critical about

[his] not attending this party." Appellant never heard any such statements personally, nor does he even know what was supposedly said or who supposedly said it, and Khachatryan affirmed on the record this never happened. (A508-09).

Fourth, Gerzhgorin identified a few stray remarks or comments made by Woolley, Khachatryan, or co-workers, which he automatically *assumed* constituted an expression of anti-Jewish sentiment or generalization. Those comments were:

- At some unspecified time and place, Woolley told Plaintiff they serve kosher food at client social events because they take place in a Jewish center. (A509).

- He overheard a co-worker (who worked for Selfhelp but not RHSP and had no authority over Gerzhgorin or his terms and conditions of employment) tell a colleague, "They get divorced to get more benefits." He did not know to whom she was referring, nor did he ask. (*Id.*).

- He overheard that same co-worker tell a colleague on a different occasion, "They used to complain in the Soviet Union. Now they complain here." He does not know the context of the statement or to whom she was referring. (A509-10).

- On a third unspecified date, he heard the same co-worker tell an intern something about how Jews cheat on their wives because they are

always pregnant, and Orthodox Jews go to Russian bathhouses and stare at women, as an explanation of how they cheat on their wives. (A510).

- A different co-worker told him Khachatryan said "descendants of Holocaust survivors are not entitled to anything," though Gerzhgorin did not hear this personally, nor does he know the context in which the comment arose. In fact, Khachatryan has discussed the rules for German reparations on multiple occasions with many different individuals. It is a rule of the Claims Conference that to be entitled to benefits one must be an actual survivor, and descendants of survivors who are not survivors themselves are not entitled to benefits. (A510-11).

Finally, Gerzhgorin claims Woolley initially expressed some reluctance about him taking 4.5 days off for religious observance in October, though when he explained he needed to take the time off or he would have to quit, she agreed to give it to him. (A101-02, A482). This is despite the fact that:

- Defendants are used to giving employees time off or other accommodations for their religious observance. (A481).

- Woolley gave Gerzhgorin time off for religious observance less than a month after he began his employment. (*Id.*).

- Woolley had accommodated Gerzhgorin beginning in August when he sought to change his schedule to better suit another job he had, even though she was under no legal obligation to do so. (A481-82).

## G. Appellant's Alleged Evidence of Retaliation

As stated above, Appellant felt his first two months of employment were like a "honeymoon." He believes that started to change when he engaged in two communications he claims were protected, which pertained to his perception of a lack of cultural sensitivity to clients (what he calls his "fresh look" emails). (A516). These two emails are the only protected activity for which Gerzhgorin believes he was retaliated against. (*Id.*).

Gerzhgorin sent his first "fresh look" email to Woolley and Khachatryan on September 25. The specific topic was the kind of music played at coffee houses; Appellant thought "Jewish music" would be more appropriate around the time of Jewish holidays than "gypsy style music." Woolley and Khachatryan thanked him for his concern and consideration but indicated clients historically enjoyed the coffee houses and had made no complaints about the music, though they encouraged him to let them know if he learned of any complaints. Gerzhgorin kept pressing the issue, including several days later during his one-on-one supervision session with Woolley, to the point that Woolley had to stop the supervision session and bring Khachatryan into the discussion. (A511-13).

During that discussion, after Woolley left, Khachatryan made several statements with which Gerzhgorin takes issue. First, she said she was not Jewish, which was truthful. Second, she said many Jews (a) lost their faith after the Holocaust, (b) eat pork, and (c) did not know what Tu Bishvat (a Jewish holiday which is the new year of trees) was, all of which Appellant acknowledges is true and which Khachatryan learned during her training, from studies she read, and through her personal experience. Khachatryan was attempting to make a point that an important tenet of RHSP is to support clients but not make them feel uncomfortable or belittled if they are not observant. Finally, she described an incident from an event, to illustrate the need for coffee houses to be a place of socializing, relaxation, and light-hearted enjoyment. (A514-16). Gerzhgorin's only objection to these statements is he did not understand why Khachatryan said them or felt she was generalizing. (A514, A515).

The second "fresh look" email was sent on October 17 (after the decision to terminate him already had been made) and pertained to Gerzhgorin's attempt to have clients hold the "four species" at the most recent coffee house. The four species are plants associated with the holiday of Sukkot. Without seeking or obtaining permission from a supervisor, Gerzhgorin decided to go from table to table, speaking with each client individually about the meaning of Sukkot and the four species and presenting them with the four species to hold. However, given the

number of clients in attendance, allowing him to proceed in this manner would have thrown the coffee house way off schedule. Moreover, RHSP always must be concerned about the possibility of a religion-based interaction discomfiting or triggering a client. Accordingly, Woolley told Gerzhgorin to stop and instead speak to the entire coffee house from the microphone about Sukkot and the four species, which he did. (A516-18).

Gerzhgorin also claims he "took issue" with what he perceived to be insensitivity or discrimination in terms of scheduling trips for clients, as many were scheduled "close to" Jewish holidays. (App. Br. at 15). However, whether he took issue with those personally or not, Appellant points to no incidents or communications in which he shared this concern with Appellees.[8]

Finally, Appellant acknowledges he ***never made any complaints*** about any perceived discrimination or harassment against him; he only raised what he perceived were cultural sensitivity issues regarding the treatment of clients. (A520).

---

[8] Indeed, the only reference in the record even touching upon this issue is a case note for client "M, R," which notes the client indicated she could not attend the Russian ballet because she was an observant Jew and the trip was on Saturday. (A356). This is a narrow issue for a single client, and there is nothing in Gerzhgorin's case notes indicating he raised this issue as a concern globally for all clients and/or for how Appellees scheduled client trips as a general matter.

## II.  PROCEDURAL HISTORY AND RULINGS FOR REVIEW

Gerzhgorin commenced this lawsuit on August 1, 2018 by filing a Summons and Complaint in the United States District Court, Eastern District of New York. (A011-27).  Appellant proceeded *pro se*, utilizing the court's form Employment Discrimination Complaint.  (*Id.*).  In the Complaint, Appellant alleged Appellees had: (1) discriminated against him on the basis of his religion (Judaism), in violation of Title VII and the CHRL; (2) discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act and the CHRL;[9] and (3) retaliated against him under federal and local law.  (*Id.*).  With respect to the adverse actions Gerzhgorin claimed were taken against him, he checked only the boxes for "terminat[ing] [his] employment" and "retaliat[ing] against [him]." (A015).  Conspicuously, Gerzhgorin did not check the box indicating Appellees harassed him or created a hostile work environment, which is clearly identified and appears on the same page as the boxes he checked for termination and retaliation. (*Id.*).  On September 14, 2018, Appellees served an Answer to the Complaint denying any liability to Gerzhgorin and asserting affirmative defenses.  (A028-38).

Appellees filed a motion for summary judgment on April 27, 2020.  (A039-530).  As relevant on this appeal, Appellees argued Gerzhgorin's complaint should

---

[9]  Appellant has conceded on appeal he cannot sustain his claims for age discrimination and thus has abandoned his pursuit of those claims.  (App. Br. at 1 n.1).  Accordingly, Appellees are not addressing those claims in this brief.

be dismissed as a matter of law because: (1) Appellant failed to establish a *prima facie* case of religious discrimination, where he was hired with full knowledge of his religion, terminated only three months later, and he provided no other evidence to sustain his claim; (2) Appellant failed to establish a *prima facie* case of retaliation, because the complaints he referenced – which were about treatment of clients, not himself or other employees – did not constitute protected activity; and (3) Appellees not only proffered, but supported and substantiated with voluminous documentary evidence, legitimate, non-discriminatory and non-retaliatory reasons for Gerzhgorin's termination – his failure to abide by Selfhelp rules and requirements, resulting in severely poor performance and insubordination – which Appellant could not possibly demonstrate was pretext.

Gerzhgorin filed his opposition papers on or about July 7, 2020 (A531-615), and Appellees filed their reply papers on or about August 7, 2020 (A616-29; SUA1-62). In addition, on February 3, 2021, Appellees submitted a letter to the Court regarding a ruling in another case whose plaintiff Gerzhgorin referenced throughout the litigation, including in his motion papers. (SUA63-73).

Judge DeArcy Hall initially referred the motion to Magistrate Judge Kuo. On March 2, 2021, Magistrate Judge Kuo filed the R&R, recommending the court grant Appellees' motion in full. (A630-67). On or about March 18, 2021, Gerzhgorin filed objections to the R&R. (A668-82). In those objections,

Gerzhgorin argued for the first time he had asserted a claim for hostile work environment on the basis of religion, in addition to a claim of discriminatory termination – which he only argued when Judge Kuo noted in her R&R he had not asserted any such claim. (A666 n.6). Appellees filed their opposition to Gerzhgorin's objections on or about April 1, 2021. (A683-718).

On March 29, 2022, Judge DeArcy Hall issued the M&O, in which, after careful review of the R&R, Gerzhgorin's objections, and Appellees' response, she adopted Judge Kuo's decision in its entirety and granted Appellees' motion for summary judgment, dismissing the Complaint in full. She also denied Appellant leave to amend his Complaint to assert a hostile work environment claim, to the extent his opposition to the R&R could be interpreted to make such a request. (A719-35). The Eastern District issued a Judgment dismissing the matter based on the M&O on March 30, 2022. (A736). On or about April 12, 2022, Appellant filed a Notice of Appeal to the United States Court of Appeals for the Second Circuit. (A737).

## SUMMARY OF THE ARGUMENT

If it were up to Gerzhgorin, every social worker at RHSP would be a native Russian speaker who practices Judaism with no exceptions.[10] This sentiment in

---

[10] Plaintiff stated he believed to be a successful social worker in RHSP one must be a native Russian speaker, as opposed to a fluent Russian speaker. (A469). Plaintiff also believed it would be "highly recommended" that a social worker in

and of itself is discriminatory in more ways than one. Selfhelp is a not-for-profit organization that has dedicated itself to serving the underserved of New York, including via programs, such as RHSP, that exist solely to assist elderly Jewish victims of the Holocaust. As a matter of policy to respect its clients' various levels of religiosity, and as a condition of certain grant funding, Selfhelp does not and may not support explicitly religious activities or instructions. However, this notion was completely lost on Gerzhgorin. Instead of performing his job duties, such as working with his clients to support their needs and recording all such efforts in case notes, he insisted on lodging complaints regarding the religiosity of music selection at social events. Gerzhgorin's "my way or the highway" attitude became untenable and adversely affected his ability to perform his duties at the level required, and he was antagonistic and resistant to all attempts to help him conform to his job requirements. Selfhelp thus made the logical decision to terminate his employment during his probationary period, because Gerzhgorin's apparent perception of the job was very different from what the job required.

Gerzhgorin never complained of religious discrimination or retaliation when he was employed with Appellees, and his current such claims are long on labels and conclusions but short on facts. He points to nothing, other than his own surmise and conjecture, to create even the slightest implication that his termination

---

RHSP be Jewish to be most successful. (*Id.*).

was related to his religion. In fact, Selfhelp has had many employees of varying religions, including Orthodox Judaism, without issue.

In reality, Gerzhgorin's employment was terminated because he failed to meet Selfhelp's legitimate business expectations for the social worker position in RHSP. Appellant demonstrated poor quality of work, insubordination, and lack of teamwork, resulting in complaints from clients. Indeed, Gerzhgorin conceded during his deposition that he chose to follow his own thoughts about what was required, rather than adhere to the standards set by his employer, though he saw nothing wrong with that.

Gerzhgorin's gripes with how Appellees ran their social programming in order to stay in compliance with their grant funding is not enough to establish a *prima facie* case of either discrimination or retaliation under any relevant statutory scheme. Furthermore, beyond the insufficiency of Gerzhgorin's *prima facie* case, Selfhelp's decision to terminate his employment was based upon quintessential legitimate, nondiscriminatory and nonretaliatory reasons – poor performance and insubordination. No employer need retain an employee who is not meeting required performance standards. Gerzhgorin's allegations to the contrary are unfounded and lack any merit whatsoever.

**ARGUMENT**

## I.   STANDARD OF REVIEW

"[I]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citations omitted). "[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to [] other areas of litigation." *Id.* (internal quotation marks and citations omitted). Indeed, this Court has confirmed "summary judgment under Rule 56 is still fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

On appeal from a grant of summary judgment, this Court must review the record *de novo* to determine whether "genuine issues of material fact exist requiring trial." *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 763 (2d Cir. 2002) (citations omitted). Although a court must construe evidence in the light most favorable to the non-moving party to the summary judgment motion, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could ***reasonably*** find for the plaintiff." *Jeffreys v. The City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (emphasis

added)).   Rather, to defeat summary judgment, "the non-moving party must demonstrate more than some metaphysical doubt as to the material facts … [it] must come forward with ***specific facts*** showing that there is a genuine issue for trial."  *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (emphasis added).  In addition, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys*, 426 F.3d at 554 (internal quotation marks and citations omitted).

Based on this well-established standard, the District Court properly granted summary judgment in full to Appellees, and that decision should be affirmed on appeal.

## II.   THE DISTRICT COURT PROPERLY DISMISSED APPELLANT'S CLAIMS OF RELIGIOUS DISCRIMINATION

### A.   Appellant Did Not Even Establish a *Prima Facie* Case of Religious Discrimination

To sustain a claim for religious discrimination under all the statutes at issue, Gerzhgorin must show that he was discriminated against ***because of*** his membership in a protected class.  *See, e.g., Burns v. Medgar Evers Coll. of the City Univ. of N.Y.*, No. 19-cv-1211 (BMC)(JO), 2019 U.S. Dist. LEXIS 136879, at *3 (E.D.N.Y. Aug. 19, 2019) ("hostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable")

(citations omitted). But he utterly failed to do so, despite his attempt to set forth numerous unfounded and illogical statements he painted as "facts."

Gerzhgorin provides a very limited argument with respect to his *prima facie* case. (App. Br. at 34-37). Essentially, he argues: (a) the lower court erred in relying on the same actor inference (erroneously claiming the district court used the presumption from the inference as a substitute for the required factual inquiry) (*id.*); (b) "the circumstances – his various complaints – give rise to an inference of discrimination" (*id.* at 34); and (c) he demonstrated an inference of discrimination based on the "anti-Semetic [sic] slurs" to which he allegedly was subjected (*id.* at 36) and a few events that allegedly demonstrate discrimination and "bullying" (*id.* at 36-37). None of these assertions come even close to meeting Appellant's burden.

> *1.   The lower court correctly considered the same actor inference and applied the appropriate weight to it*

As Appellant himself concedes, Khachatryan knew Gerzhgorin's religion from the hiring process. (App. Br. at 5). Yet, Khachatryan happily hired him with that knowledge. (A471). Claiming she did so only to terminate him a few months later is faulty; it is illogical to believe she either knowingly hired a Jew if she had a bias against Jews or suddenly developed such a bias in three short months. *Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *see also Snowden v. Trs. of Columbia Univ.*, No. 12 Civ. 3095 (GBD), 2014 U.S. Dist. LEXIS 42543,

at *27-28 (S.D.N.Y. March 26, 2014) ("[w]here, as here, an employee is already a member of the protected class when hired, any inference of … discrimination when [his] employment is terminated is undermined") (citations omitted), *aff'd*, 612 Fed. Appx. 7 (2d Cir. 2015) (summary order); *Ruane v. Cont'l Cas. Co.*, No. 96 Civ. 7153 (LBS), 1998 U.S. Dist. LEXIS 8141, at *24-25 (S.D.N.Y. June 3, 1998) ("claims that employer animus exists in termination but not in hiring seem irrational:  It hardly makes sense to hire workers from a group one dislikes (thereby incurring the costs of associating with them), only to fire them once they are on the job").

Gerzhgorin claims the effect of the same actor inference is "substantially vitiate[d]" because no single actor, but rather several individuals, participated in the decision to terminate him.  (App. Br. at 36-37).  That, however, is an incorrect statement of law.  The same actor inference "is applicable as long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff." *Jones v. Yonkers Pub. Schs*, 326 F. Supp. 2d 536, 546 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  There is no question that Khachatryan was substantially involved in both Appellant's hire and termination, and so the lower court correctly considered the same actor inference.

Gerzhgorin also claims the lower court incorrectly relied too heavily on the same actor inference, to the exclusion of a factual assessment.  (App. Br. at 35-36).

29

Yet it is very clear from reviewing the R&R and M&O that this is patently false. Indeed, Magistrate Judge Kuo specifically wrote in the R&R that "application of the presumption here does ***not*** end the inquiry" (emphasis added), and it was "still necessary to evaluate Plaintiff's claim that he was discriminated against on the basis of his religion" (A659) – which she then did over the ensuing 3.5 pages. Indeed, Gerzhgorin raised this as an objection to the R&R, and Judge DeArcy Hall noted, "Judge Kuo found that, regardless of the presumption, Plaintiff failed to establish a prima facie case of discrimination. … Judge Kuo's decision did not rest on this presumption …" (A734).

Finally, Gerzhgorin claims the inference is "not dispositive" because an inference going the other way can be drawn from alleged "anti-Semetic [sic] slurs" to which he was subjected. (App. Br. at 36). However, as demonstrated *infra*, there never were any anti-Semitic slurs – except apparently in Gerzhgorin's own mind. Gerzhgorin's arguments regarding the same actor inference thus amount to nothing.

>    2.    *Appellant's complaints are irrelevant to his claim of discrimination*

Gerzhgorin inexplicably argues that "his various complaints … give rise to an inference of discrimination." (App. Br. at 34). But the fact that Gerzhgorin made complaints about the treatment of clients has nothing to do with whether he can state a claim of discrimination on the basis of his own religion. At best,

making complaints is relevant to establishing a *prima facie* case of retaliation, not discrimination (though, as explained further in Section III.A, these complaints do not suffice even for a retaliation claim). Gerzhgorin has not cited even a single case to support his assertion that his complaints about client treatment can create a discriminatory inference on the basis of his own protected characteristic. Accordingly, this does not assist Appellant in stating a *prima facie* case of religious discrimination.

> ### 3. *Appellant was not subjected to anti-Semitic slurs or other discriminatory conduct*

Gerzhgorin claims he was subjected to "anti-Semetic [sic] slurs" (though he does not define or identify what they were), as well as discriminatory and "bullying" conduct. (App. Br. at 36, 37). However, there never were any anti-Semitic slurs – except apparently in Gerzhgorin's imagination – nor was any of the conduct he points to reasonably susceptible of a biased intent.

First, with respect to alleged slurs, Gerzhgorin does not enumerate them in his argument section, nor does he explain how any of the comments or statements fit the definition of an anti-Semitic slur. Rather, it seems as though he concludes any time anything regarding Judaism was discussed or brought up, it had negative connotations. But that is not the case. Indeed, neutral discussions or events in the workplace about religion-related issues, such as kosher food, do not give rise to an inference of discrimination. *See, e.g.*, *Weber v. City of New York*, 973 F. Supp. 2d

227 (E.D.N.Y. 2013) (remarks about kosher food and denial of kosher food at work event not evidence of discrimination); *Kerman-Mastour v. Fin. Indus. Regulatory Auth.*, 814 F. Supp. 2d 355 (S.D.N.Y. 2011) (no evidence of discrimination under federal, state or city law when plaintiff believed it "culturally insensitive" that employee of defendant did not make arrangements for plaintiff to have kosher meal at work lunch).

Furthermore, when the statements identified in his factual recitation are examined, it is clear they were hardly "slurs."[11] Rather, Gerzhgorin is doing his best to twist the comments around to try to make them appear negative, though he utterly fails in that endeavor. Based on a review of the record, and giving Gerzhgorin the benefit of the doubt as a *pro se* litigant, it appears the comments he attempts to characterize as slurs are:

---

[11] Of course, any statements Gerzhgorin did not hear personally cannot be considered, as that is hearsay. Moreover, comments by co-workers, which Gerzhgorin admits were never reported to anyone at Appellees, cannot be imputed to the employer. *See* Section IV.B *infra* for further discussion on both these points.

Furthermore, alleged comments by co-workers, who admittedly had nothing to do with Gerzhgorin's termination or setting the terms and conditions of his employment, constitute "stray remarks." "In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d. Cir. 1998). Even "the stray remarks … of a decision-maker, without more, cannot prove a claim of employment discrimination." *Id*. *See also, e.g.*, *Adam v. Glen Cove School*, No. 06-CV-1200 (JFB), 2008 U.S. Dist. LEXIS 13039, at *27 (E.D.N.Y. Feb. 21, 2008) ("stray remarks by [] non-decisionmakers are insufficient, without other evidence, to raise an inference of discrimination").

- Woolley mentioning the sale of a kosher bottle of wine to Gerzhgorin in an email to RHSP, with no indication by Appellant that she spoke in a derogatory or negative way.

- Woolley's statement that they serve kosher food at client social events because the events take place in a Jewish center.

- Khachatryan generally commenting that she did not care what food ended up being selected for an end-of-summer party (without any reference on her part to kosher vs. non-kosher food).

- Khachatryan's statement that she is not Jewish (which Gerzhgorin acknowledges is accurate, and he does not explain how this could possibly demonstrate bias – unless he is claiming everyone who is not Jewish has a bias against Jews, which is in itself a discriminatory viewpoint).

- Khachatryan's statement that many Jews (a) lost their faith after the Holocaust, (b) eat pork, and (c) do not know what Tu Bishvat (the Jewish new year of trees) is (all of which Gerzhgorin acknowledges is correct).

- • Khachatryan's description of an incident at an event, at which a client fainted and others continued to eat (which Gerzhgorin had no basis to believe did not occur).

Gerzhgorin had to stretch quite far to come up with negative implications from any of these statements – especially when most of Khachatryan's remarks were made in the context of teaching about the principles on which client service is based and the need to be accommodating and understanding of clients, and they were based on Khachatryan's knowledge gained from classes she took and her past experience. (A514-16). Certainly, from an objective standpoint, these are not at all derogatory of Judaism or even culturally insensitive, even if Appellant claims he subjectively interpreted them that way. Gerzhgorin cannot create animus by attributing an ulterior motive out of thin air. This is especially true given that his primary objection to Khachatryan's statements is he did not understand why she said them or he felt she was generalizing. (A514, A515). Appellant's lack of understanding (or refusal to acknowledge Khachatryan's experiential and educational basis for her statements) does not amount to discrimination. Indeed, his attempt to take these statements out of context to try to come up with evidence emphasizes the weakness of his case.

Second, with respect to alleged "bullying" and other so-called discriminatory conduct, Gerzhgorin falls far short of making a claim as well.

Appellant claims one aspect of this is Woolley's alleged initial reluctance to give him four-and-a-half days off for religious observance in October during his probationary period, though he admits when he explained he needed to take the time off or he would have to quit, she agreed to give it to him. (A101-02, A482). Gerzhgorin provides no evidence or indication that any bias, as opposed to a misunderstanding or misapprehension of the importance of this time off, sparked Woolley's behavior. In any event, Appellant admits Woolley did allow him the time off, and in fact, she previously had given him additional time off for religious observance less than a month after he began his employment, with no issues. (A481). This detracts from any implication of biased conduct in the later response.

Gerzhgorin also alleges Woolley "bullied" him by calling clients to solicit complaints. Appellant, however, has no personal knowledge of this, and in fact, as demonstrated by the record, Woolley merely received the complaints and did not solicit them. (A499-502). Appellant seems to rest his entire argument in this regard on one occasion in which Woolley called a client after a coffee house to make sure he arrived home safely after a coffee house, and while they were on the phone, he made a complaint against Gerzhgorin. (A126, A326). But the fact that Woolley initiated the telephone call does not mean she solicited any complaints about Gerzhgorin – and in any event, determining if someone has a complaint about an employee is hardly "bullying."

Finally, Gerzhgorin asserts that Woolley treated him differently than co-workers (identifying two comparators – Sevinch and Inessa), because (a) he experienced subjectively longer supervision sessions, sometimes with the door closed, and (b) he had to carbon copy Woolley on emails. (A505-06). As an initial matter, Sevinch and Inessa were not Gerzhgorin's comparators because he was in a probationary period while they were not. (A506). But, even if they could be considered comparators, Gerzhgorin has directly admitted he ***does not believe*** Woolley applying these different rules to him was due to his religion. (A505-07).[12] Accordingly, this cannot support a *prima facie* case of religious discrimination.

4. *Summary for* prima facie *case*

Ultimately, Gerzhgorin has offered nothing beyond his membership in a protected class and his beliefs to support his claims. This falls far short of the competent evidence needed to raise a triable issue of fact. *See Lizado v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) ("Plaintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race. This is not sufficient") (internal citations omitted). Indeed, Selfhelp has

---

[12] Moreover, with respect to the obligation to carbon copy Woolley, Gerzhgorin admitted he does not actually know if Woolley required this of others reporting to her, and he never spoke with those co-workers (or Woolley) to find out. (A506). Appellant thus has no factual basis to even claim he was treated differently with respect to carbon copying. And in fact, Woolley had a general policy (that she followed with her own supervisor, Khachatryan) to be copied on emails, to put herself in a position to jump in on a case if needed. (A507).

served Jewish refugees and Holocaust survivors for over 80 years. For Gerzhgorin to claim Appellees are discriminating on the basis of Judaism – the very population RHSP supports – is, frankly, bizarre. Dismissal of his claims for religious discrimination should accordingly be upheld.

### B. Selfhelp Has Articulated Legitimate, Nondiscriminatory Reasons For Its Actions, and There Is No Evidence These Reasons Are Pretextual.

Even if the Court were to find there is enough evidence to satisfy Gerzhgorin's *prima facie* case of religious discrimination (which there is not), his claims still fail as he is unable to produce admissible evidence that Appellees' legitimate reason for his termination was a pretext for discrimination. To the contrary, and as explained in greater detail below, the relevant undisputed facts demonstrate Appellees exercised reasonable business judgment in terminating Appellant because he did not meet job expectations.

### 1. *Appellees have not only proffered, but substantiated, legitimate nondiscriminatory business reasons for Appellant's termination*

Within RHSP, there are a multitude of policies and requirements (some written, some verbal, but all important) outlining protocols and guidelines for service to clients. Gerzhgorin did not perform with the level of thoroughness and timeliness required by the protocols and guidelines to adequately execute his job responsibilities. Woolley learned this after she undertook an audit of Gerzhgorin's cases, due to a number of client complaints. As discussed in Appellees' Statement

of Relevant Facts above, and in greater detail in the record on appeal, the following are examples of Gerzhgorin's severely poor performance:

- ***Failure to engage in monthly client contact***.  From mid-July to mid-September, 22 of Gerzhgorin's 42 clients did not receive a single communication from him for over a month, and just during September he did not interact with 17 of his clients.  Moreover, Gerzhgorin tried but failed to reach at least two of these clients, rendering them "missing" for purposes of contact, but he failed to notify his supervisor.  (A483-86).

- ***Failure to complete home visits***.  Gerzhgorin was required to complete a home visit with each client during the first 2½ months of employment.  Yet, as of October 3 (the three-month mark), he still had not met in person with approximately 25 of his clients – more than half.  (A486-88).

- ***Failure to call his clients each month about attending a coffee house.***  Gerzhgorin also refused to participate in set up, client interaction, and clean up at coffee houses, as was reiterated to him on several occasions.  (A495-99).

- ***Failure to adequately record case notes***.  This included both failing to record every contact pertaining to a client, and not including sufficient substantive information in many of the case notes he did make.  (A492-94).

38

- ***Failure to properly follow up with clients***. This includes returning client calls and following up on client requests or emergency situations. (A488-92).

- ***Failure to emotionally connect with clients***. This caused a severe enough impact that some clients and/or their families requested a new social worker. (A499-501).

Gerzhgorin's poor performance is indisputably a legitimate business reason for termination. *See, e.g.*, *Hess v. Mid Hudson Valley StaffCo LLC*, 776 Fed. Appx. 36, 37 (2d Cir. 2019) (summary order) ("[a]ssuming, *arguendo*, that Hess established a *prima facie* case of … discrimination, StaffCo articulated a legitimate, non-discriminatory reason for her termination—Hess's poor performance").

In addition to his poor performance, Gerzhgorin became increasingly difficult to work with. It seemed as though any effort to steer him back on the right path fell on deaf and insubordinate ears. Knowing coffee house attendance was mandatory, Gerzhgorin still chose to show up late, remain in the kitchen, and leave early. (A497-98). Woolley attempted to address many issues with him in the first week of October by reminding him of RHSP's protocols and standards, in addition to identifying immediate steps for improvement. (A502). Yet Gerzhgorin

not only continued to blatantly ignore his duties and Woolley, he blamed everyone but himself for his poor performance. In response to any performance issues his supervisor attempted to address, he immediately became defensive and argumentative without basis. Courts recognize that insubordination is a legitimate, nondiscriminatory reason for termination of an employee. *See, e.g.*, *Kemp v. A & J Produce Corp.*, 164 Fed. Appx. 12, 16 (2d Cir. 2005) (summary order).

### 2. *Appellant failed to, and cannot, establish pretext*

As Gerzhgorin concedes, once a legitimate non-discriminatory reason is asserted, it is his obligation to demonstrate it to be pretext and that the evidence supports a reasonable inference of discrimination as a motivating factor to survive summary judgment. (*See* App. Br. at 37-38). Moreover, when as here, an employer does "'not merely articulate – but substantially establish[es] – legitimate, nondiscriminatory reasons for [discharge, it] render[s] more difficult [the employee's] task of proving pretext.'" *Watson v. Geithner*, Nos. 09 Civ. 6624 (HBP), 10 Civ. 3948 (HBP), 10 Civ. 7282 (HBP), 2013 U.S. Dist. LEXIS 139673, at *32 (S.D.N.Y. Sept. 27, 2013) (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)).

Yet Gerzhgorin fails to **_even attempt_** to rebut the legitimate reasons for which he was terminated, let alone demonstrate that there would have been a jury question on that issue. Rather, Gerzhgorin's entire argument on appeal about

40

pretext seems to be the single statement, "[T]here is ample evidence that the complaints against him were specious and that the reasons given for termination were pretextual" (App. Br. at 39) – with no factual recitation or support provided for that conclusory remark.[13]   Appellate courts "generally decline to 'scour the record' to construct arguments on a party's behalf." *Ferraro v. New York City Dep't of Educ.*, 752 Fed. Appx. 70, 74 (2d Cir. 2018) (summary order) (citing *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002)).  Indeed, in his "Statement of Facts," he identifies nothing pretextual about any of the performance issues or concerns raised by Appellees, and he does not attempt to discount or even address the exhaustive explanation provided by Appellees for terminating him.  To the contrary, he admits multiple of the failings identified, and for others he states he "purportedly" engaged in them, but he does not dispute they occurred.  (App. Br. at 19-21).

On this basis alone, the District Court's decision granting summary judgment on Appellant's religious discrimination claim should be upheld.  But even if this Court chooses to explore further, it is clear Gerzhgorin cannot rebut, on a substantive level, the criticisms raised about him, which led to his termination.

---

[13]     Immediately after that statement, Appellant cites *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), for the proposition that it "rejects any reliance upon an Establishment Clause claim made by Defendant below."  (App. Br. at 39). Appellees are flummoxed by this argument, because a review of the entire record reveals Appellees never said anything about the Establishment Clause, nor was that

For example, he does not deny he failed to make monthly contact with all of his clients, but rather claims there is nothing wrong with that, because he "just used [his] common sense as a social worker" to determine whether the client needed to be contacted. (A474, A503). That, however, was not his decision to make, and it certainly bears no connection to his religion. Similarly, Gerzhgorin does not deny he failed to make home visits with more than half his assigned clients as required, but instead claims he made independent determinations of whether a home visit was required based on assessments conducted by prior social workers. (*Id.*). Again, it was not his prerogative to choose with which of his employer's requirements he complied and which he would ignore.

Essentially, Gerzhgorin tries to discount or minimize the work requirements set by his employer in the hopes that will pass for demonstrating pretext. But the courts have made very clear this does not suffice to meet a plaintiff's burden at this third stage of the analysis. A discharged employee must do more than challenge the employer's decision as contrary to "sound business or economic policy," since such an argument does not permit "a quantum leap to an inference" that discharge was due to discrimination. *Nash v. Jacqueline Cochran, Inc.*, 548 F. Supp. 676, 681 (S.D.N.Y. 1982). A plaintiff's subjective belief that his work was satisfactory does not raise an inference of pretext. *See, e.g.*, *Dawson v Bumble & Bumble*, 246

---

clause even mentioned in either the R&R or the M&O.

F. Supp. 2d 301, 321 (S.D.N.Y. 2003) (citing *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129-30 (2d Cir. 1996)), *aff'd*, 398 F.3d 211 (2d Cir. 2005). Indeed, it is not Gerzhgorin's opinion, but the opinion of the employer, that is relevant when determining whether an individual has met the legitimate job expectations of his position and/or whether circumstances warrant his termination. Neither Appellant nor any court or agency may substitute its own judgment for the judgment of the decision-makers, as it is no one else's role "to act as a super personnel department that second guesses employers' business judgments." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001); *see also Delaney v Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) ("[w]hile we must ensure that employers do not act in a discriminatory fashion, we do not sit as a super-personnel department that reexamines an entity's business decisions") (internal quotation marks and citation omitted) ; *Peters v. Mount Sinai Hosp.*, No. 08 Civ. 7250 (CM), 2010 U.S. Dist. LEXIS 32884, at *23 (S.D.N.Y. 2010) ("courts have consistently held that they may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by discrimination").

Moreover, beyond his inability to demonstrate pretext, Gerzhgorin can point to no evidence indicating discrimination was the real reason for his termination. Indeed, he could not even establish an inference of discrimination at the *prima*

*facie* stage, which means he certainly cannot establish pretext now. As explained in that analysis above, Gerzhgorin has not pointed to any statement by a decision-maker that negatively implicated his religion. His religion was not even mentioned during his termination meeting. (A522). Gerzhgorin also cannot make any logical inference of attaching discriminatory bias to his termination, because he was hired and fired by the same individual within a short period of time. Indeed, the only "evidence" Plaintiff provides of discriminatory animus are based on contortions of the facts, which in and of themselves provide not even a whiff of discrimination. Plaintiff cannot rely on his "own beliefs and speculations" that he was terminated because of his religion. *Satterfield v. United States Parcel Service, Inc.*, No. 00 Civ. 7190 (MHD), 2003 U.S. Dist. LEXIS 17229, at *47 (S.D.N.Y. Sept. 30, 2003).

Appellees' decision to terminate Gerzhgorin for poor performance and insubordination were matters of business judgment and should, therefore, not be reviewed by the Court, especially where the Plaintiff has not met the most basic burden of proof. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d, 708, 714 (2d Cir. 1996) ("[Plaintiff] put forward nothing other than conclusory allegations to suggest a causal relationship between [his] complaints … and either [his] negative … evaluation or her termination. There was no material issue of fact for the jury to consider"). As Gerzhgorin is unable to show Appellees' legitimate

business reasons for his termination are pretext for discrimination, summary judgment on these claims should be upheld.

## III. THE DISTRICT COURT PROPERLY DISMISSED APPELLANT'S CLAIMS OF RETALIATION

### A. Appellant Failed To Identify Any Protected Activity In Which He Engaged, And Thus The District Court Properly Concluded He Could Not Establish A *Prima Facie* Case Of Retaliation

There is no dispute that, prior to his termination, Gerzhgorin never made any complaints regarding employment-related conduct, whether directed at himself or another employee, and whether engaged in by Appellees or another party. Rather, as Gerzhgorin himself admits, the only complaints he made pertained to his perception of cultural insensitivity in the provision of services to clients. Accordingly, if those complaints are not considered protected activity, Appellant has conceded he has no retaliation claim.

That is exactly the case here. Gerzhgorin asserted an employment discrimination claim (*see* A011, A013-14). For such a claim, an employee engages in protected activity only when he complains about an "employment practice" he reasonably believes violates the law against employment discrimination (*Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988)), and, in that complaint, he uses "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of" membership in a protected class. *John v.*

*Kingsbrook Jewish Med. Ctr. / Rutland Nursing Home*, No. 11 Civ. 3624 (MKB), 2014 U.S. Dist. LEXIS 39322, at *57-58 (E.D.N.Y. Mar. 25, 2014), *aff'd*, 598 Fed. Appx. 798 (2d Cir. 2015) (summary order); *see also Klestadt v. Duncan*, No. 14-CV-2831 (NGG) (LB), 2016 U.S. Dist. LEXIS 24026, at *15 (E.D.N.Y. Feb. 26, 2016) ("The employee's complaints must make clear to the employer that the employee believes [he] is being discriminated against on the basis of a protected trait") (citations and internal quotation marks omitted). An employee "must allege some form of discrimination prohibited by Title VII for the complaint to be protected." *Williams v. Home Depot U.S.A., Inc.*, 02 Civ. 5353 (DAB), 2005 U.S. Dist. LEXIS 22254, at *44 (S.D.N.Y. Sept. 30, 2005), *aff'd*, 2006 U.S. App. LEXIS 24064 (2d. Cir. Sept. 19, 2006) (internal citations omitted); *see also Malaney v. El Al Isr. Airlines*, 331 Fed. Appx. 772, 775 (2d Cir. 2009) (summary order) (plaintiff's complaints to supervisor did not include allegations of discrimination sufficient to demonstrate participation in protected activity and, as such, failed to establish *prima facie* retaliation claim); *Manoharan*, *supra*, 842 F.2d at 594 (affirming district court's finding that plaintiff did not prove good faith, reasonable belief that complained-of activity was unlawful employment practice, where essence of complaint, at time it was made, was directed at something not properly within definition of unlawful employment practice).

Gerzhgorin clearly fails to satisfy this standard, because his complaints concerned *client* satisfaction and treatment and had nothing to do with allegations of discrimination or impropriety directed at *him* (or another employee) or regarding his (or another employee's) terms of employment. Complaints about the treatment of clients is not a complaint about conduct prohibited by Title VII or the CHRL, which means they are not considered protected activity. *See, e.g.*, *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1999) (plaintiff's claim of retaliation for opposing co-employee's discrimination against non-employees not cognizable under Title VII because "his opposition was not directed at an unlawful employment practice of his employer"); *Neita v. Precision Pipeline Solutions*, No. CV 15-649 (JS) (AKT), 2018 U.S. Dist. LEXIS 32898, at *60 (E.D.N.Y. Feb. 26, 2018) (plaintiff "could not have possessed a reasonable, good faith belief that he was engaged in a protected activity where he never raised a complaint or challenged an employment action as being related to his race or ethnicity, or any other statutorily prohibited form of discrimination"); *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013) ("Courts have repeatedly held … a teacher's complaints about alleged discrimination directed against a student do not constitute opposition to an unlawful employment practice").

In an attempt to circumvent this very clear and well-established rule of law, Gerzhgorin cites several cases in his appellate brief he claims permits his retaliation case to go forward. But Appellant disingenuously misleads this Court as to the holdings and import of these cases.

First, Gerzhgorin cites *McMenemy v. City of Rochester*, 241 F.3d 279 (2d Cir. 2001), claiming a report regarding "the actions of third parties with no employment relationship to either plaintiff or defendant" was held to support a *prima facie* case of retaliation under Title VII. (App. Br. at 29). However, Gerzhgorin misconstrues the meaning of that case. In *McMenemy*, there was no question that the plaintiff had complained about an unlawful "employment practice"; rather, the question was whether the employer who engaged in the employment practice about which he complained and the employer who retaliated had be the same employer. This Court found the plain language of Title VII did not require the employer *about whom* the plaintiff complained to be the same employer *to whom* the plaintiff complained. 241 F.3d at 283-85. Rather:

> Title VII protects an employee from *any* employer, present or future, who retaliates against him because of his prior or ongoing opposition to an unlawful employment practice or participation in Title VII proceedings.

*Id*. at 284 (emphasis in original).

This holding clearly is inapposite to the present case. As compared with *McMenemy*, there is no question that Gerzhgorin's complaints were not about an

48

"employment practice," but rather were solely about client service practices. Thus, *McMenemy* cannot salvage Gerzhgorin's retaliation claims.

Second, Gerzhgorin cites *Lopez v. New York City Dep't of Educ.*, No. 17-CV-9205 (RA), 2020 U.S. Dist. LEXIS 133548 (S.D.N.Y. Jul. 28, 2020), which he claims held that advocacy of special education students "constitutes protected activity under … the Rehabilitation Act." (App. Br. at 31). Appellant seems to be attempting to draw a comparison between the Rehabilitation Act and Title VII/the CHRL, such that if advocacy on behalf of non-employees is covered under the Rehabilitation Act, it also would be covered here. The critical problem with this thesis is that the plaintiff in *Lopez* brought his claims under ***Section 504*** of the Rehabilitation Act. 2020 U.S. Dist. LEXIS 133548, at *15. Section 504 prohibits disability discrimination in connection with programs or activities receiving federal financial assistance and does ***not*** require the conduct to be tied to employment, nor does it require a plaintiff to allege the offender engaged in an unlawful "employment practice." *See* 29 U.S.C. § 794. In contrast, there is no dispute that Appellant's retaliation claims are based on the employment provisions of Title VII and the CHRL, which means he had to complain about unlawful employment practices to state a claim. Gerzhgorin's attempt to rely on this case, when it dealt with a wholly different statutory provision, is disingenuous at best.

Third, and similarly, Gerzhgorin cites *Manigaulte v. C.W. Post of Long Is. Univ.*, 659 F. Supp. 2d 367, 275 (E.D.N.Y. 2009) for the proposition that a non-disabled individual who files a complaint of disability discrimination under the Americans with Disabilities Act ("ADA") is engaging in protected activity. However, Appellees never disputed that an individual can advocate for others under the provisions of Title VII and the CHRL utilized in this case – as long as the advocacy pertains to conduct the individual believes, reasonably and in good faith, violates the statute at issue. In the instant matter, that would require the complaint to be about an unlawful "employment practice" – which, as previously discussed, was not the nature of Gerzhgorin's complaints.[14]

Indeed, this distinction has been addressed by multiple courts. For example, in *Volpe v. New York City Dep't of Educ.*, 195 F. Supp. 3d 582 (S.D.N.Y. 2016), the plaintiff was a special education teacher in the New York public school system. She brought retaliation claims against her employer under, *inter alia*, the Rehabilitation Act and the ADA, claiming she was treated adversely because she advocated for her special education students. The court explained the plaintiff was asserting claims based on the provisions pertaining to anti-discrimination in the provision of public services, not the "employment" provisions.

---

[14]     It also is relevant that the ADA has public accommodation provisions like the Rehabilitation Act (contained in Title III), as well as provisions with respect to public services (contained in Title II), and the retaliation provisions in ADA Title

> The fact that the alleged retaliation occurred in a workplace at the hands of an employer does not bring it within Title I if the claim is not one for discrimination in employment on the basis of an employee's disability.

*Id.* at 593.

Gerzhgorin made one true and determinative statement in his appellate brief regarding his retaliation claims:

> The focus in determining the viability of the "protected activity" prong of a retaliation claim, must be on whether or not the acts reported by the plaintiff constitute conduct prohibited by Title VII. **If … the conduct complained about does not violate Title VII, no retaliation claim is stated**.

(App. Br. at 30) (emphasis added). Here, the caselaw makes perfectly clear that complaints about the treatment of clients, customers, and other third parties are not complaints about an "employment practice." In other words, as a matter of law, Gerzhgorin's "fresh look" emails do not constitute protected activity. Accordingly, and as found by the district court, he failed to state a *prima facie* retaliation claim.[15]

---

V apply equally to those obligations.

[15] Gerzhgorin's October 17 fresh look email cannot sustain his retaliation claim for a second reason. By the time it was written, the decision to terminate Plaintiff already had been made. (A521). It is clearly impossible for that email to have contributed to a decision made before it existed. *See, e.g., Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (where reorganization and demotion decision made before alleged protected activity taken, it "could not have been in retaliation for" that activity) (case cited by Appellant at App. Br. at 31).

**B.      Appellant Failed To, And Cannot, Rebut Selfhelp's Legitimate, Nonretaliatory Business Reasons for Termination**

Even assuming *arguendo* Gerzhgorin successfully alleged a *prima facie* case, he did not rebut the legitimate reasons for his termination (indeed, he hardly even made the attempt), let alone demonstrate that there would have been a jury question on that issue.  As described in Section II.B, *supra*, it is clear Gerzhgorin was not adequately performing his job responsibilities and was not following his supervisor's instructions.  Thus, Appellant must present evidence that retaliation was the but-for cause of his termination.  *Montanez v. McDean LLC*, 770 F. Appx. 592, 595 (2d Cir. 2019) (summary order).

Gerzhgorin has utterly failed to do so.  As explained in Section II.B *supra*, Gerzhgorin cannot rebut, on a substantive level, the criticisms raised about him, which led to his termination, and his personal disagreement with the importance of his compliance with Appellee's rules is irrelevant.  Indeed, there is no evidence that Gerzhgorin's "fresh look" emails – or anything other than his performance issues – played any role in his termination.  *See, e.g.*, *Smith v. N.Y. & Presbyterian Hosp.*, 2020 U.S. Dist. LEXIS 27243, at \*59 (S.D.N.Y. Feb. 18, 2020) ("several large inferential leaps are required to reach [the] conclusion" that the adverse action was connected to protected activity); *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 276-77 (S.D.N.Y. 2007) (no pretext where plaintiff "failed to argue or to offer any evidence contrary to defendants' reasons").

Moreover, the timing between Gerzhgorin's first "fresh look" email and his ultimate termination is not enough to sustain his claims. *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage"). Gerzhgorin thus fails at this stage of the analysis as well, and dismissal of his retaliation claims should be upheld.

## IV. THE DISTRICT COURT PROPERLY DISMISSED APPELLANT'S FAR-TOO-LATE ASSERTED CLAIMS OF HOSTILE WORK ENVIRONMENT

### A. Appellant Never Asserted A Hostile Work Environment Claim Until He Made Objections to the R&R, Which is Too Late

For the first time in his objections to the R&R, Gerzhgorin argued he had asserted a claim for harassment on the basis of religion, in addition to discriminatory termination. It appears he only thought to argue this because Judge Kuo mentioned in her R&R he had not asserted any claim for hostile work environment. (*See* A666 n.6). His objection to this statement by Judge Kuo was based on his claim that he "alleged incidents of harassment and hostile work environment at his deposition and in Rule 56.1 statements." (A676). This, however, as determined by Judge DeArcy Hall, is too little, too late.

There is a significant difference between claiming *incidents* of harassment occurred and asserting a *cause of action* for harassment/hostile work

environment.[16]  Here, as explained further below and by Judge DeArcy Hall, Gerzhgorin at best engaged in the former, not the latter.

Appellant filed his Complaint *pro se*, and so he utilized the court's form Employment Discrimination Complaint.  (A011-27).  With respect to the kinds of adverse actions Gerzhgorin claimed were taken against him, he checked only the boxes for "terminat[ing] [his] employment" and "retaliat[ing] against [him]."  (A015).  Conspicuously, Gerzhgorin did not check the box indicating Appellees "harassed [him] or created a hostile work environment," which is clearly identified and appears on the same page as the boxes he checked for termination and retaliation, in plain language readily understandable by *pro se* plaintiffs.  (*Id.*).

Gerzhgorin thus made a conscious decision not to assert such a claim in this case.  Moreover, during his deposition, Appellant was asked about the claims he was asserting, and he confirmed he was pursuing claims for age discrimination, religious discrimination, and retaliation, and that his lawsuit contained no other claims.  (A077-78).

As noted by Judge DeArcy Hall, Gerzhgorin does not dispute he failed to indicate on the Complaint form he was pursuing a hostile work environment claim.

---

[16]    For example, a plaintiff can identify alleged incidents of harassment to attempt to demonstrate a defendant maintained a bias on the basis of a protected classification, where only a discriminatory termination claim is asserted.

(A726).  Rather, he argues he asserted a hostile work environment claim in his 56.1 Statement and at his deposition.  (*Id.*).  This is insufficient.[17]

As Judge DeArcy Hall accurately explained, a litigant, even one proceeding *pro se*, may not assert new claims for the first time in opposition to a motion for summary judgment.  *See, e.g.*, *Oyewo v. Lahood*, 515 Fed. Appx. 10, 11 (2d Cir. 2013) (summary order) (*pro se* plaintiff "abandoned" claim "by raising it for the first time in opposition to [defendant's] motion for summary judgment") (citing *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006)); *Avillan v. Donahoe*, 483 Fed. Appx. 637, 639 (2d Cir. 2012) (summary order) (district court did not err in disregarding allegations *pro se* plaintiff raised for first time in response to defendant's summary judgment motion) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *Shah v. Helen Hayes Hosp.*, 252 F. Appx. 364, 366 (2d Cir. 2007) (summary order) ("[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint" (citation omitted)).  Nor may a party properly raise new claims in the form of objections to a report and recommendation, as Gerzhgorin did here.  *See e.g.*, *Irish v. Tropical Emerald LLC*, No. 18-CV-82 (PKC) (SJB), 2022 U.S. Dist. LEXIS 124043, at *16 (E.D.N.Y. Jul. 13, 2022) ("In this district and circuit, it is established law that a

---

[17]    In addition, Gerzhgorin's argument that he raised the claim in his deposition is inaccurate.  As explained *supra*, he may have identified **incidents** of alleged harassment, but he never asserted a **claim** of hostile work environment, and he

district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not") (internal quotation marks and citation omitted); *Garcia v. Scheiderman*, No. 16-CV-2584 (ALC), 2019 U.S. Dist. LEXIS 172791, at *8-9 (S.D.N.Y. Oct. 4, 2019) ("[N]ew claims may not be raised properly at this juncture, so any new claims, presented in the form of, or along with, objections, should be dismissed") (internal quotation marks and citation omitted). Gerzhgorin did not assert a hostile work environment claim in his Complaint and did not amend his Complaint to include one. Appellant cannot belatedly seek to assert this claim just because he does not like the outcome of his conscious choices.

Notably, Gerzhgorin ignores entirely this insurmountable stumbling block, instead confining his hostile work environment section solely to the "merits." (App. Br. at 40-44). Clearly, he understands and appreciates he has no valid argument for his failure to ever assert a hostile work environment claim until stage two of the summary judgment motion (*i.e.*, review of the R&R), and so he skipped over it, perhaps hoping no one would notice or remember he never asserted such a claim in the first place. But the Court should not be taken in by those tactics. The dismissal of this purported claim should thus be affirmed.

---

confirmed (by omission) in his deposition he was not pursuing such a claim.

**B.** **Even if One Were to Consider *Arguendo* Appellant's Hostile Work Environment Claim on the Merits, the District Court Properly Dismissed It**

Although it was not necessary to do so, Judge DeArcy Hall, in an exercise of caution, also examined Gerzhgorin's so-called harassment claim on the merits and correctly found it could not have been sustained on this record. As the court explained (A727), and as Appellant conceded (App. Br. at 40-41), to establish a hostile work environment claim, Gerzhgorin would have had to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks and citation omitted). "This severe or pervasive standard has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 (2d Cir. 2010) (internal quotation marks and citation omitted).

As carefully explained by Judge DeArcy Hall, Gerzhgorin premised his unasserted hostile work environment claim on three categories of comments: those by a co-worker he overheard; those reported to him by a third party he did not hear

himself; and those to him by Khachatryan and Woolley. (*See* A727). None of these, whether examined separately or overall, are sufficient to sustain a harassment claim.

First, the allegedly overheard co-worker comments cannot be imputed to Appellees. Because they were made by a co-worker, an employer only can be liable "if it either failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Legg v. Ulster Cty.*, 979 F.3d 101, 115 (2d Cir. 2020) (internal quotation marks and citation omitted). Appellees demonstrated Gerzhgorin had multiple avenues of complaint (*see, e.g.*, A404-07), and Gerzhgorin has not even attempted to argue otherwise. Moreover, Appellant has offered no evidence that anyone at Appellees had any knowledge of these statements; to the contrary, he acknowledged he never complained about them to anyone at Selfhelp. (A520). Accordingly, these co-worker comments, assuming *arguendo* they were made, cannot support a hostile work environment claim. *See, e.g.*, *Magnusson v. County of Suffolk*, No. 14-CV-3449 (SJF)(ARL), 2016 U.S. Dist. LEXIS 64897, at *33-34 (E.D.N.Y. May 17, 2016) (employer cannot be held liable for coworker's conduct, even if offensive, where employer provided avenues for complaint but plaintiff never reported conduct) (citing, *inter alia*, *Pa. State Police v. Suders*, 542 U.S. 129, 134, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004));

*Kennedy v. J.P. Morgan Chase & Co.*, 325 F. Supp. 2d 401, 410 (S.D.N.Y. 2004) (same).

Second, the alleged comments reported to Gerzhgorin by his co-worker (Tsekhanskaya) are the epitome of hearsay and thus not valid evidence for consideration. Hearsay is "an out of court statement offered to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A court will not consider testimony or statements where the declarant has no personal knowledge of the subject and offers only inadmissible statements conveyed to the declarant by a third party. *See, e.g., I.T. v. N.Y.C. Dep't of Educ.*, 15-cv-3894 (WFK), 2020 U.S. Dist. LEXIS 133614, at *13 (E.D.N.Y. July 14, 2020) (out-of-court statements "offered to prove the truth of the matter asserted are inadmissible hearsay"); *Fashakin v. Nextel Communs.*, No. 05-cv-3080 (RRM), 2009 U.S. Dist. LEXIS 25140, at *19-20 (E.D.N.Y. Mar. 25, 2009) (statement allegedly made to plaintiff by third party for truth of events is hearsay, as plaintiff had no personal knowledge of those events and no affidavit was offered by anyone with personal knowledge). Hearsay that would not be admissible at trial is likewise not competent evidence on a summary judgment motion. *See, e.g., Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (plaintiff's statement as to what he "was told" was hearsay that would not be admissible at trial and therefore not sufficient evidence to create genuine issue of fact on summary judgment).

An employee cannot prevail on a hostile work environment claim premised on conduct the employee did not himself witness. As the Second Circuit has held, "Title VII's prohibition against hostile work discrimination affords no claim to a person who experiences it by hearsay." *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 182 (2d Cir. 2001). Indeed, the Second Circuit explicitly rejected the idea of expanding employer liability for a hostile work environment to allow for recovery by an employee "made distraught by office gossip, rumor, or innuendo." *Id*. Thus, Khachatryan's alleged comments to Tsekhanskaya, heard secondhand by Gerzhgorin, cannot support his hostile work environment claim, and the lower court was correct to disregard them. *See, e.g.*, *Mikhaylov v. Y & B Transp. Co.*, No. 15-CV-7109 (DLI) (VMS), 2019 U.S. Dist. LEXIS 59203, at *9 (E.D.N.Y. Mar. 31, 2019).

Third and last, the handful of alleged comments to Gerzhgorin by Woolley and/or Khachatryan fall far short of sustaining a claim for hostile work environment, particularly when viewed objectively. As an initial matter, Gerzhgorin claims the statements on which he relies (though he does not identify them in his argument section) revealed "hatred, contempt, or hostility" based on his Jewish faith when viewed in toto (though he seems to concede individually they are insufficient). (App. Br. at 41). But from an objective standpoint, they reveal anything but, and it is only Gerzhgorin's twisting and self-serving

interpretation of those statements that provide any negative context to them. *See* Section II.A.3 *supra*.

Moreover, even if there was any reasonable way of viewing these statements as representing a negative view of Judaism, Gerzhgorin utterly failed to demonstrate these few comments, made over the course of 3.5 months, created an objectively abusive environment, as they are neither severe nor pervasive, nor did they interfere with his ability to work. *See, e.g.*, *Lewis v. N. Gen. Hosp.*, 502 F. Supp. 2d 390, 403 (S.D.N.Y. 2007) (granting summary judgment in favor of employer; three or four instances over three-month period did not create hostile work environment where instances were not objectively severe); *Ennis v. Sonitrol Mgmt. Corp.*, No. 02-CV-9070 (TPG), 2006 U.S. Dist. LEXIS 2599, at *23 (S.D.N.Y. Jan. 25, 2006) (comments over approximately five months, including "Oh, you guys get these holidays all the time," insufficient; "[w]here a hostile work environment claim is grounded in religious hostility, court have been particularly cautious in adhering to the principle that the hostile or offensive conduct must involve some coercive or abusive behavior"); *Chiara v. Town of New Castle*, 126 A.D.3d 111, 126 (2d Dep't 2015) (at least a dozen comments over the course of one-plus years, including calling plaintiff a "Jew lover" and calling yeshiva a "Jew farm," insufficient; they were merely "offensive utterances which did not interfere with the plaintiff's work").

In summary, even if Gerzhgorin had asserted an action for hostile work environment (which he did not), it would fail.  The district court thus properly dismissed that purported claim.

## **CONCLUSION**

For the foregoing reasons, Appellees respectfully request this Court affirm the decision granting them summary judgment, dismiss Gerzhgorin's action in its entirety with prejudice, and award all such other and further relief this Court may deem just, proper, and equitable.

Dated:     Melville, New York
           October 24, 2022

Respectfully submitted,

JACKSON LEWIS P.C.
*Attorneys for Defendants*
58 South Service Road, Suite 250
Melville, New York 11747
(631) 247-0404

By: /s/        *Diane Krebs*
           Diane Krebs, Esq.

## **CERTIFICATE OF COMPLIANCE UNDER FRAP 32(g)(1)**

This document complies with Fed. R. App. P. 32(a)(7)(B)(i) and Local App. Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,793 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word in 14 pt. Times New Roman.

Dated:      Melville, New York
           October 24, 2022

                       JACKSON LEWIS P.C.
                       *Attorneys for Defendants*
                       58 South Service Road, Suite 250
                       Melville, New York 11747
                       (631) 247-0404

                       By: /s/      *Diane Krebs*
                           Diane Krebs, Esq.

4863-2318-9050, v. 1